**FIRST NATIONAL BANK OF AKRON,**

v.

**William F. CANN et al., Defendants and
Third–Party Plaintiffs,**

v.

**Harold S. CASSIDY et al., Third–Party
Defendants.**

**Civ. A. No. C78–186A.**

United States District Court,
N. D. Ohio, E. D.

June 4, 1980.

Frank E. Quirk and Harley M. Kastner, Akron, Ohio, for plaintiff.

Hal D. Cooper, Barry L. Springel, Cleveland, Ohio, Gary A. Banas, Robert F. Orth, Steven E. Sigalow, Akron, Ohio, Albert J. Biro, Cleveland, Ohio, David R. Wilson, George Pappas, Elizabeth Reilly, Akron, Ohio, for defendants and third–party plaintiffs.

## MEMORANDUM OPINION AND ORDER

CONTIE, District Judge.

Invoking the Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332, plaintiff, First National Bank of Akron (Bank), brings the above captioned action against defendants William F. Cann and Building and Equipment Corp. of America (B.E.C.).[1] Plaintiff is a national banking association incorporated under the laws of the United States,

---

1. Defendant B.E.C. was an Ohio corporation which ceased to exist as a corporate entity on October 31, 1971, when it merged into its parent corporation, Bank Building and Equipment Corp. of America, a Delaware Corporation. For the sake of clarity, said defendant will consistently be referred to as B.E.C.

having its principal place of business in Akron, Ohio. Defendant Cann is a citizen and a resident of a state other than Ohio. Defendant B.E.C. is a Delaware corporation. The amount in controversy exceeds $10,000.00, exclusive of interest and costs. The within action was tried to the Court, and the following shall constitute the Court's findings of fact and conclusions of law in accordance with Rule 52, Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT

### A. *The Bank's Remodeling Project*

In the mid–1960s the Bank's management decided to refurbish the interior and exterior of its main building located at 106 South Main Street, Akron, Ohio. Up until that time, Harold S. Cassidy had provided all the architectural services required by the Bank since their first association in 1952. Said services included the remodeling of existing structures and the design and erection of new structures, and were performed by Cassidy as an independent contractor.

In 1966 Cassidy was involved in the design and construction of a connecting link and loading dock at the Bank's main building and adjacent to a developing public plaza. The project required the cooperation and approval of the local City government, which Cassidy's long relationship as the Bank's local architect facilitated securing. When the Bank approached Cassidy with the prospect of taking on the more expansive exterior and interior remodeling of the main building, however, he informed them that his office was not in a position to handle the project. This was the first Bank project requiring architectural services that Cassidy was not in charge of since the inception of their association.

B.E.C. is a corporation engaged in the business of assisting lending institutions in making improvements to their physical facilities, providing assistance in the selection of an architect, and management of the construction if the proposed improvements are undertaken. In 1966, John T. Huffman was employed by B.E.C. as a senior consultant, and represented that company in its efforts to sell its services. James L. Hilton was the Bank's vice president in charge of property management and security. Huffman initially contacted the Bank through Hilton. The Bank eventually expressed interest in B.E.C.'s services, and the consulting and architectural agreements presented by Huffman were executed. On November 3, 1966, B.E.C. and the Bank entered into the consulting agreement. On November 17, 1966, the Bank entered into a standard architect agreement with William F. Cann, a licensed architect and employee of B.E.C.

At that time Cann was president of B.E.C. All architectual fees paid to Cann were turned over by him to the company. Cann was then paid by the company in his capacity of president; he received no separate compensation as an architect. Cann never personally disclosed this arrangement to the Bank, but held himself out as an individual architect in executing the architect agreement.

In a letter dated April 12, 1967, Cann proposed an association between himself and Cassidy, through which Cassidy would act as a local architect during the construction phase of the architectural agreement. This contact was initiated because it was B.E.C.'s common practice to hire a local architect for intricate, remote jobs such as the Bank's remodeling project. Cassidy signed the proposal and dated it June 6, 1967. This written proposal, approved by Cassidy, was not a fully integrated agreement. By its explicit terms, the proposal covered only the principal items and left open the precise relationship between Cann and B.E.C. to further negotiations.

On June 6, 1967, Cassidy met Cann at his St. Louis office to refine the terms of their relationship. It was agreed that Cassidy would both make periodic visits to the site and assist and supervise the work only when so requested. Cassidy refused to assume any greater responsibility because of the demands of his private practice. Cassidy did agree to turn over his drawings of the connecting link and loading dock. This allowed one architect to coordinate a single

project. From January to November, 1967, Cassidy attended a number of meetings between the Bank, Cann, and B.E.C. in order to facilitate coordination of Cann's remodeling plans and Cassidy's work on the connecting link and loading dock.

Thus, retaining Cassidy as the local architect was the logical choice for two reasons of considerable import: first, it achieved the necessary coordination between B.E.C.'s responsibility for the extensive remodeling project and the two minor facets of the Bank's refurbishing already begun by Cassidy; and second, it provided B.E.C. with an experienced liaison who maintained a standing relationship with both the Bank and the City government.

On June 22, 1967, the Bank and B.E.C. entered into a management agreement to achieve the satisfactory completion of the remodeling project. The contract contained a cost incentive clause. Under the agreement B.E.C. became the construction manager for the project and was responsible for all work necessary to complete the project. Thus, B.E.C. was both the consultant and the construction manager, and its president Cann was the architect.

Actual construction commenced on the project in January, 1968, and was completed by November, 1969. The exterior remodeling included the erection of a granite facing on the Bank's south wall. The instant action is solely directed to alleged problems involving the granite facing on the south wall, and no other aspect of the project is in dispute.

## B. The Plans For The South Wall

A curtain wall construction was utilized to erect the granite facing consistent with the following specifications set out in the plans.[2] The type of curtain wall erected on the Bank's south wall is a non–load–bearing design. The granite skin consists of some 500 individual panels two inches thick and otherwise varying in size. Some of the panels weigh up to 800 lbs. The curtain wall's non–load–bearing design provides for intermediate steel supports at each floor level so that the total weight of the granite is not transferred to the bottom.

The south wall is comprised of three elevated sections. The west elevation is ten stories in height and approximately 45 feet in length. The center section is four stories in height and approximately 57 feet in length. The east elevation is seven stories in height and approximately 70 feet in length. The plans called for the erection of an aluminum screen between the west and east elevations from the top of the center elevation to the tenth floor level. The granite skin turns the inner corners of the west and east elevations closest to the aluminum screen, extending back one column and beginning at the top of the center section.[3]

The courses of granite are supported at each floor by steel shelf angles that are affixed to the Bank's existing infrastructure by either masonry plates or masonry angles. When properly constructed, this non–load–bearing design completely transfers at each floor level the weight of three to four courses of intermediate granite panels back into the infrastructure of the Bank through the shelf angles and masonry attachments.

The shelf angles are constructed of three–quarter inch steel. Their vertical and horizontal members meet to form a 90° angle. The vertical member is three and a half inches in height and the horizontal member extends outward two and a half inches. With the exception of the areas where glass windows and doors are placed, at each floor level these shelf angles span without interruption behind the entire

---

2. Unless more specifically identified, the plans shall collectively refer to the contract documents for job no. 22805, which include: (1) the consulting agreement; (2) the owner–architect agreement, A.I.A. Doc. B–131 (ed. 1963); (3) the management agreement; (4) the general conditions of contract, A.I.A. Doc. A201 (ed.

1963); (5) the architectual and structural plans for the project, and (6) the specifications for the project.

3. These panels of granite are denominated as return pieces.

granite face of the south wall's three elevations.

The granite panels were to be secured in their vertical and horizontal planes by a combination of retaining devices. The shelf angles were constructed with a one–eighth inch steel continuous retainer bar, which fit into the kerf of the bottom of the pieces of granite comprising the first course at each floor level. The plans called for stainless steel three–sixteenth inch pins inserted through one–quarter inch holes in the horizontal members of the shelf angle; the pins were received by pockets cut into the top of the pieces of granite located immediately below each shelf angle. Intermediate courses of granite were to be retained by split–tail anchors inserted in the pockets cut into the interior wall and filled with quick set cement.

An existing party wall where another building had once abutted the Bank's south wall had to be removed. A new parapet block wall was erected and held the masonry angle attachments. Spandrel beams were placed horizontally along the length of the block wall. Steel bent plate straps were to be welded to the spandrel beam and the Bank's existing steel infrastructure. The purpose of this specification is to prevent the spandrel beam from rotating in its horizontal plane and the block wall from moving away from the existing wall. Holes were cut into the Bank's terra cotta existing wall and masonry plates were attached to stub beams running back into the Bank's steel infrastructure. Thermal and structural integrity was enhanced with the specification that the holes in the terra cotta be filled with mortar.

Shelf angle and masonry attachment connections were to be intimate and bolted. All structural steel was to be covered with a factory applied prime coat. No welding, cutting, drilling, or burning could be done in the field without the architect's approval. All rivets, bolts, and damaged surfaces of the shop coat were to receive a field coat of primer. A granite cap was placed at the top of each elevation and spanned the cavity between the granite face and the existing south wall. A one–half by three–quarter inch reglet was cut along the length of the cap pieces of granite. This reglet was to receive a stainless steel flashing material that ran back across the top of the parapet wall, covering the cavity between the curtain wall and the existing structure.

The granite was to be set in a bed of mortar. Horizontal and vertical joints between abutting pieces of granite were to be one–quarter inch in width, and raked out to a depth of three–eighth inch. Mortar droppings from the buttered joints that fell behind the granite panels were not to accumulate in excess of three and one–half inches. The plans called for the use of either one of two brands of silicone sealant to be applied in caulking the joints in accordance with the manufacturer's specifications. Under such specifications; the sealant was to be applied at a minimum thickness of one–eighth inch with a bond breaker.[4]

Bond breakers are generally installed as a backing for the caulking to prevent adherence to the third side of the joint. In 1967, however, the state of the art did not require that a reasonably prudent architect specify the use of a bond breaker. The manufacturers of the two silicone sealants that could be used in caulking the south wall both recommended bond breakers for adequate caulking. Depending on the depth of the joint and the thickness of the caulking, either a foam back–up rod or a non–adhering tape was to be used as a bond breaking material.

Silicone sealant as a caulking has a useful life of 15 to 20 years. It should not require a maintenance inspection for at least 10 years. The next most durable material used for caulking has half the useful life. Applying sealant without a bond breaker allows it to adhere to all three sides of joint. Strain is placed on the extreme fiber of the

4. One manufacturer recommended application of the sealant bead at a minimum thickness, but not less than $\frac{1}{8}$ inch. The other recommended application according to a joint width/bead thickness ratio of 2:1. The plans called for joints $\frac{1}{4}$ inch thick.

sealant that is bonded to three sides whenever the joints expand or contract. Seasonal thermal forces cause such movement. The resulting strain appreciably shortens the useful life of the sealant, and causes premature caulking failures.

### C. *Acceptable Variations Between Plans and Construction*

There are two reasons why the finished structure may legitimately vary from the initial plans. First the actual fabrication of the construction materials may require that the shop drawings vary from the plans. Second, variations in remodeling construction are often necessary to overcome the dimensional anomalies of meeting existing job conditions.

Shop drawings are made from the architectural plans by the fabricators of the steel and granite materials. These shop drawings are the final word as to how the work should proceed on the job site, and supersede the architectural plans. Not surprisingly, shop drawings require the approval of the architect, who examines them for conformance with the design concept of the project and for compliance with the specifications of the contract documents. Thus, approved shop drawings will always carry out the original intent of the plan. The shop drawings for the Bank project are no longer available; neither the fact of their existence nor their location is known.

Often, actual construction must vary from the letter of the plan to accommodate existing job conditions. Such variances, when acceptable, carry out the intent of the plans and are made under the direction of the contractor. They are what amount to technical noncompliances. Other variances that would substantially deviate from the intent of the plans require submission by the contractor to the architect for approval.

The plans for the Bank's south wall provided for a certain amount of tolerance to meet anticipated job conditions. For example, tolerance along the granite facing's vertical plane is demonstrated by virtue of the fact that the shelf angle bolt holes were elongated in length. Similarly, the granite slabs were fabricated with kerf and pockets of dimensions greater than were actually necessary to receive the various anchoring devices. This allowed for tolerance in the granite facing's horizontal plane.

### D. *Erection of South Wall*

Construction began on the south wall project in January, 1968, and was completed by November, 1969.

Thomas J. Millerbaugh was the project architect employed by B.E.C. who represented Cann on the job site. Thus, it was Millerbaugh's responsibility to discharge all architectural duties on the job site. His responsibilities included approval of shop drawings and of requests for material variances in construction if submitted. Also, Millerbaugh was required to familiarize himself generally with the progress and quality of the work and to determine in general if the work was proceeding in accordance with the plans. These general observations were also required to provide a basis upon which the architect could determine whether to issue a certificate of payment.

Exhaustive or continuous on–site inspections of the quantity and quality of the work were not required. The construction proceeded in such a fashion that the steel components were exposed only for a short period of time. The courses of granite were erected as the steel supports were installed floor by floor. Millerbaugh never approved any variation from the plans for the south wall project.

Nonetheless, even the most general observations would have detected the inordinate amount of welding and cutting of structural steel on the south wall. Field welding required inspection and certification by the architect. Also, the architect's approval was required for all cutting. The welding and cutting by the laborers contrary to the plans and with the frequency manifested on the south wall could not have gone undetected by the project architect.

Edward F. White was employed by B.E.C. as the job superintendent for the

south wall project. Thus, he represented B.E.C. on the job site. One of his primary duties was to conduct on–site inspections as the work progressed to assure that the material and work conformed to the plans and were of good quality. No inspections, however, were ever conducted by White personally or at his request, as he felt it was not his responsibility.

Cassidy was never requested to approve any shop drawings, or any applications for construction variances. Nor was he ever requested to conduct any on–site inspections.

### E. *The Discovery of Problems on the South Wall*

Anthony Quatraro is employed by the Bank as the building manager. His responsibility for the building includes keeping the south wall under general visual observation from the ground. In the Fall of 1976 he and Hilton noticed that caulking had failed and panels had dislodged on the south wall around the area of the Bank's logo at the ninth floor of the west elevation.

The south wall's curtain design provides for a measure of horizontal tolerance. Thus, it appeared that pushing the panels back in their horizontal plane and tuck pointing the joints would suffice to remedy the problem.

Between the Fall of 1976 and August, 1977, Quatraro observed no change in the dislodged panels. Although the maintenance manuals for the remodeling project provided to the Bank by B.E.C. made no mention of periodic inspection or maintenance of caulking on the south wall, Quatraro knew the caulking required upkeep. In late Spring of 1977, the maintenance job for the south wall was let out to bid. From the responses to the bidding process, repair specifications were prepared by the Bank in July, 1977. The job was given to the company submitting the lowest bid: M–A Construction Co.

Frank Brown & Sons, Inc., is an established masonry contractor in the Akron area with considerable experience in the erection of curtain walls. In late Spring, 1977, Donald L. Brown, the secretary of the Brown Co., and Michael Brown, a construction supervisor of the Brown Co., visited the south wall in response to the maintenance job the Bank let out to bid. Their opinion was that, because it had been installed without a bond breaker, the caulking had failed, allowing water to seep in the cavity, freeze and push out the granite panels. This problem is generally remedied by simply pushing back the dislodged panels in the curtain wall and tuck pointing[5] the area. The Brown Co. did not bid on the maintenance job as it considered itself primarily a masonry contractor not interested in tuck pointing.

The work proceeded until August, 1977, when, upon the discovery of structural problems, the Bank decided to terminate M–A and to retain engineering services. A swing scaffold had been suspended from the roof for the job. When the work reached the area of the logo, however, the joints were opened and structural problems with the supporting steel were uncovered.

Several engineering firms were discussed, and it was finally decided to retain Glaus, Pyle, Dehaven, & Associates (Glaus–Pyle), located in Akron, Ohio. On September 2, 1977, Howard Fleming, a Glaus–Pyle representative, met with Quatraro and was given a tour of the south wall. On September 6, Fleming and Ralph A. Hendrick, who is the head of Glaus–Pyle structural design department, conducted an inspection of the south wall.

Their preliminary findings were reduced to writing in a memorandum dated September 7, 1977, and directed to Quatraro. It was their opinion that the granite panels had become unstable and presented a dangerous condition. Furthermore, a recommendation was made that the granite panels be removed from sections of the wall so

---

**5.** Tuck pointing involves cutting out mortar joints, and then repointing the joints with mortar. The repair specifications prepared by the

Bank in July, 1977, called for the use of waterproof mortar.

that the underlying supporting structure could be observed.

Hendrick took charge of the project and became responsible for observing the condition of the curtain wall construction as the granite face was being removed, determining what caused several of the granite panels to dislodge, and designing the corrective steps to be taken. Additionally, it was his responsibility to see that the corrective work was completed at a reasonable cost to the Bank, to verify the accuracy of all billing, and to approve all invoices for payment by the Bank.

In September, 1977, the Brown Co. was again requested by the Bank to examine the south wall. This inspection included the examination of the interior of the curtain wall through a hole made from inside the Bank. A third visit was made in October when the Brown Co. removed a number of cap granite pieces for examination. It was at this time that the Brown Co. was retained under a verbal agreement to undertake the corrective work designed by Glaus–Pyle. This agreement was reduced to writing on December 13, 1977.

All the corrective work on the south wall was done by Brown Co. under the supervision of Glaus–Pyle. The Brown Co. was retained on a time and materials basis, because the precise nature and extent of the problems on the south wall could be uncovered and verified only as the work proceeded.

Several contacts were made between the Bank, Cann, and B.E.C. during the period in which the corrective work was undertaken on the south wall. In June, 1977, the Bank requested and received from B.E.C. copies of certain drawings pertaining to the original plans for the Bank project. On September 14, after M–A uncovered structural problems on the south wall, the Bank attempted to contact Cann by phone at the B.E.C. office in St. Louis, but was informed that he had retired. During this phone conversation, Hilton advised Carl J. Weiss, the new president of B.E.C., that problems with the south wall had surfaced. Weiss assured him that B.E.C. would investigate

immediately. Robert Young, B.E.C.'s area salesman, was directed to arrange a meeting between B.E.C. representatives and the Bank.

The meeting convened on September 21, 1977, at the Bank's main building. William R. Palmer attended as B.E.C.'s representative. Also present at the meeting were Hilton, Quatraro, Hendrick, Donald Brown, and Young. Palmer and Young were shown the conditions on the south wall that concerned the Bank. They departed stating that they would get back to the Bank on the matter. Upon returning to the B.E.C. office in St. Louis, Palmer expressed his opinion that the problem with the south wall was an isolated one.

Not receiving any further response relative to the September 21 meeting, Hilton placed a call to B.E.C. and spoke to Weiss, who offered to provide without cost the engineering services for the corrective work. Hilton refused to accept the offer because he felt that it was an inadequate answer to the problems encountered on the south wall.

On October 26, 1977, counsel retained by the Bank sent Cann a letter advising him that the Bank intended to seek redress for the conditions on the south wall. The letter further advised that it was the Bank's position that "the means by which the [granite] sections were fixed to the building was modified in the field from the manner provided in the plans and specifications." The same letter was also sent to B.E.C. on October 27.

Palmer made a second visit to the south wall on November 16, 1977, with Mr. Chacos, an engineer retained by B.E.C., to inspect and report on the corrective work. They met with Quatraro and Michael Brown, and went up the south wall on a permanently erected scaffold to observe the conditions where the granite skin had been removed. In a letter dated December 8, 1977, Palmer informed Hilton that Chacos was "retained by B.E.C. to inspect and report ... on the work being done and already completed ... in conjunction with the granite removal." Palmer also request-

ed that Chacos be allowed to inspect the work and "get all the facts about the problem." The Bank acquiesced in the arrangement, and at least on one occasion subsequent to this letter Chacos met with Quatraro at the Bank.

Except for a third visit in December, 1977, Palmer had no other involvement relative to the problems encountered with the granite wall. There were no other communications among the Bank, Cann, and B.E.C. concerning the south wall until the filing of the instant action.

F. *Repairing the South Wall*

Initially, the corrective work on the south wall focused on the cap pieces of granite and the west elevation in the area of the Bank's logo. It soon became apparent, however, that the conditions requiring corrective work pervaded the south wall. Thus, Glaus–Pyle decided to remove the entire granite face.

Removal of the granite commenced on November 4, 1977. It was decided to permanently scaffold the entire south wall and to deploy a crane for the corrective work, rather than to use a swing or spider scaffold.[6] This decision was made primarily for two reasons. First, there is a safety factor: a swing scaffold is mobile and unsafe for work involving the degree of force necessary to remove the granite panels. A permanent scaffold also protects the public from any debris that might fall to the heavily traveled plaza below. Second, there is an economic factor: a swing scaffold would require more manual handling of the granite panels, increasing the danger of injury to the workers and the granite. The greater caution with which the workers must proceed on a swing scaffold also translates into additional man–hours to complete the job.

A crane with a boom of 150 feet was necessary, because several factors limited the area in which it could be placed. Finally, a 75 ton crane with a 150 foot boom was selected and rented from the Lucco Company. A 50 ton crane with a boom of 150 feet, which was available for rental from the Lucco Company, was not considered in the selection process.

Permission from the City of Akron was required and obtained for placement of the crane on the job site. It was also necessary to use swamp mats and to install shoring under the plaza floor to support the weight of the crane and protect the ceiling of a subterranean parking lot.

The rental fee for the Lucco crane was $100 per hour for use and $100 per day for idle time. During the period of the corrective work, the crane sat idle for approximately one month while the Brown Co. waited for replacement granite of a compatible color to be delivered. Although the Lucco Company expressed its desire to have the crane returned until the replacement granite arrived, it was not economical to do so because of the arrangements that had been made for its original placement at the job site.

Reinstallation and all corrective work were completed by May, 1978. The estimated date of completion and cost of repairs were revised a number of times because problems with the original construction continued to surface on the south wall as the work progressed. The work was completed by the Brown Co. under the supervision of Glaus–Pyle. Its scope was the correction of the substantial deviations between the south wall as constructed and the specifications set out in the plans, and the replacement of structural steel damaged by unorthodox cutting and welding.

All bills submitted to the Bank by the Brown Co. were for labor and materials [7] expended on the job and paid for by the Brown Co. These bills were approved for

---

6. A swing or spider scaffold is pulled up and down the side of a building's wall by electric motors that are anchored to the roof.

7. No credit was issued to the Bank for unused materials purchased for the job. It is not, however, the usual practice in the construction industry to issue such credit, as there is generally an existing inventory that is brought to the job without charge.

payment by Glaus–Pyle. On a number of occasions Hilton authorized the Brown Co. to work overtime. The corrective work could have been completed within the same time period without the authorization of overtime.

A number of measures were taken to keep costs down. Labor costs were reduced by using the oiler on the crane as a hook–up man. Bricklayers, working at a lower hourly rate than welders, welded masonry anchors that made contact with the granite as required by their union contract.[8] Rust was removed by wire brush, which is more economical than sandblasting. The granite was reinstalled following the same line that B.E.C. had originally erected the curtain wall on. This allowed the split–tail anchors already in place to be reused.

What began as a routine maintenance of the joints and caulking of the granite face on the Bank's south wall ended with the completion of a costly, major repair of defective construction. It is not certain when, if ever, the wall would have collapsed. It is certain, however, that the south wall was replete with unsafe conditions that both constituted substantial, material deviations from the plans and resulted in a structurally unsound building.

G. *The Nature and Extent of the Defects on the South Wall*

As the corrective work began, the first conditions encountered established the cause of the caulking failure that had initially motivated the Bank to solicit tuck pointing bids. A caulking other than a silicone compound was used on the entire south wall. It had been applied at a thickness of no greater than one–sixteenth of an inch, and without the use of a bond breaker. The caulking was found in a failed state on over half of the south wall less than 10 years after completion of the project because both the material used and method of application were contrary to the plans and constituted substantial noncompliances. The caulking had been in a failed state for many years, and was readily visible through inspection.

As the granite was removed course by course from the three elevations on the south wall, a number of conditions at variance with the original plans[9] were uncovered. The steel flashing that fit into the reglet in the cap pieces of granite and covered the curtain wall cavity were not installed as specified under the plans. There were areas where mortar droppings were systematically introduced behind the granite panels in excess of three and one–half inches.

These conditions created a sponge effect whereby moisture entered the curtain wall through either the failing caulking or the areas at the cap pieces of granite that were left exposed by the absence of steel flashing, and accumulated in the excess mortar. Also, the moisture that naturally entered the curtain wall[10] collected in the mortar buildup. When inclement weather caused the accumulated moisture to freeze, the resulting thermal pressure dislodged the panels.

Over eighty–five percent of the shelf angles were installed without the one–eighth inch continuous retainer bar. Instead, other retaining devices were used along the horizontal legs of the shelf angles. Steel

8. No structural welding was done by the bricklayers, however.

9. As previously noted, shop drawings may deviate from the architect's plans and prevail on the construction site if so approved. The shop drawings, however, will conform to the overall intent of the architect's plans. For the purposes of the within action, the inference is drawn that the shop drawings mirrored the architect's plans. The grounds supporting the inference are as follows: (1) there is no evidence that the shop drawings were approved so as to deviate materially from the architect's plans; and (2) a number of conditions found on the south wall amount to substantial noncompliances that would be structurally unacceptable under the intent of the architect's plans and therefore under any shop drawings that were properly approved.

10. The curtain wall erected on the Bank's south wall was not hermetically sealed. Therefore, it is inevitable that some moisture will enter the wall naturally.

pins were used contrary to the plans on over forty percent of the south wall and were wholly inadequate as retaining devices for the bottom of the granite panels resting on the shelf angles. Split–tail anchors and steel straps were used as retaining devices along the remainder of the shelf angles.

Although they may suffice as adequate substitutes for the continuous retainer bar if installed under proper supervision, the condition that many were discovered in demonstrates that such was not the case. Often, the steel straps had been inadequately welded and the split–tail anchors had been nailed to the shelf angles. Both these methods were contrary to the plans and constituted unacceptable substitutes for the continuous retainer bar. None of these substitute methods as utilized were structurally acceptable devices for retaining the granite to the shelf angles.

The combination of the failed caulking, mortar buildup, and inadequate retaining devices caused the several granite panels to dislodge under the thermal pressure of the freezing moisture. Many pieces of granite were found with pieces broken out of the back where these substitute retaining devices fit into the kerf. Moreover, these conditions continued to present the danger that other panels might similarly dislodge and become unstable.

There were numerous instances of welding and cutting of the structural steel, which caused the shop coat of primer to be damaged. Contrary to the plans, these damaged areas did not receive a field coat of primer. These exposed areas of steel rusted as moisture entered the curtain wall cavity. Although rust did not necessitate the replacement of any structural steel, it had to be removed by wire brush to complete properly the corrective work.

Much of the welding and all of the cutting of structural steel were contrary to the plans and conducted without the approval of B.E.C. or Cann. Under the plans, all cutting required the approval of the architect. None was approved, however. The singular fact that the welding and cutting, and other alterations made in the field, were contrary to the plans does not establish that the procedures were unacceptable variations. But the condition of the steel, as uncovered by the Brown Co. and inspected by Hendrick, demonstrates that these and other variations were structurally unsound. Thus, they constituted substantial noncompliances and were not merely technical deviations.[11]

In many places notches were cut into the horizontal legs of the shelf angles. Also, the bolt holes in the vertical legs of the shelf angles were elongated and notched out to an open end at the edge of the leg. Approximately nine feet of the total footage of shelf angle on the south wall had been cut in such a fashion that the vertical and horizontal legs had been completely detached. The legs were extended and reattached with welded steel bar or plate connections. These are examples of cutting that were not approved by the architect as required by the plans, and which seriously detracted from the strength of the angle.

The plans called for bolted connections between the masonry plates and the stub beams running back into the Bank's existing infrastructure. The connections were welded, however. Moreover, the welded connections were generally found to be inadequate and required rewelding.

In securing the shelf angles to the masonry attachments a number of alterations at variance with the plans were made in the field. The alterations were generally inadequate, because they resulted in a load transfer and thus constituted substantial deviations from the plans.

A load transfer results when the structural steel fails to transfer the weight of the granite back into the existing infrastructure. The presence of a load transfer on the Bank's south wall created a seriously

---

11. A technical noncompliance or deviation is a variation which carries out the intent of the plans and does not otherwise affect the structural soundness of the construction. A substantial noncompliance or deviation, on the other hand, seriously affects the building's structural integrity.

defective and unsafe condition. It is critical in the type of curtain wall construction deployed on the Bank's south wall that the weight of the granite skin is transferred at intermediate levels back into the existing infrastructure. A non–load–bearing design is essential; otherwise, the entire weight of some 500 pieces of granite weighing up to 800 pounds each would be transferred down the columns from course to course to the bottom. Thus, a load transfer causes the weight of the granite skin to bear upon the bottom panels having a width of two inches, and creates a dangerous condition.

The lack of intimate contact between the shelf angles and masonry attachments lessens the shelf angle's resistance to tension forces. The weight from above then results in a twisting action on the shelf angles. The inability of the shelf angles to resist these forces allows a load transfer to occur.

Over much of the south wall, the connections between shelf angles and masonry attachments were not intimate. Double plate welded connections affixing the shelf angles to the masonry attachments were accomplished in such a manner that there was no point of surface contact between them. The only explanation for this unacceptable variation is that the cavity between the curtain and existing walls increased as the original construction progressed. It was a variation that resulted in a load transfer, and otherwise would have required approval.

In other places shims and washers were inserted between the shelf angle and masonry attachment. Very little of the bolt protruded out beyond the vertical leg of the shelf angle, allowing only a few threads of the nut to receive the bolt. In some cases so little of the bolt was exposed beyond the surface of the vertical leg that the connection had to be welded. There was an insufficient amount of weld used to make some of these connections. These various shimming devices precluded any intimate contact between the shelf angles and masonry attachment. Thus, less stress was required to bend the bolt, and cause a load transfer. Similarly, the stress acted as a dangerous shearing force bearing upon the bolts.

Inadequate bolted connections were also found at the edge of elongated bolt holes that had been extended along the vertical leg of the shelf angle to an open end. These bolted connections placed at the edge of the vertical leg were inadequate for two reasons. First, thermal forces could cause the granite panels to move up and down along their vertical plane and slip off the bolt completely. Second, the location of the bolted connection at the edge of the vertical leg makes the shelf angle more likely to twist under the weight of the granite panels above. Both conditions are dangerous and would result in a load transfer.

When the return pieces were removed during the corrective work, it was discovered that the shelf angles were completely omitted. The only devices retaining the granite panels on the returns were split–tail anchors. Moreover, the split–tail anchors were nailed in place, not set in quick set cement as required by the plans. It was an inadequate substitution that created a dangerous condition. Without the shelf angles, the entire weight of the granite was transferred to the bottom piece, which rested on the top of the center elevation. Also, the split–tail anchors were inadequately attached to the existing wall, failing to provide the support necessary to ensure that wind forces would not suck the return pieces off the wall.

The pockets cut into the Bank's terra cotta wall to receive the masonry plates that were attached to the existing steel infrastructure had not been filled with mortar as required by the plans. This condition constituted a substantial deviation because it allowed moisture leaking through the granite skin to enter the building. The unfilled pockets also adversely affected the building's thermal integrity by creating a greater heat loss.

As the corrective work focused on the east elevation it was discovered that the steel bent plate straps, which were to be welded to the spandrel beams inserted in the block wall and the Bank's existing steel infrastructure, had been omitted. The

block wall was found to have slightly veered away from the existing wall. The spandrel beams had rotated in their horizontal plane. There is a substantial likelihood that without the steel bent plate straps the block wall, and thus the granite skin, would have eventually collapsed.

## II. CONCLUSIONS OF LAW

Plaintiff asserts a number of theories of joint and several liability in both contract and tort against defendants Cann and B.E.C. Defendants argue three grounds for avoidance of liability. First, defendants contend that plaintiff failed to give the requisite written notice of a claim for damages. Second, it is defendants' position that the one-year limitation period set forth in the contract documents bars plaintiff's claims. Third, defendant Cann maintains that principles of equity estop plaintiff from recovering on its claims.

Article 31 of the general conditions of contract provides:

> DAMAGES
>
> Should either party to the Contract suffer damages because of any wrongful act or neglect of the other party or of anyone employed by him, claim shall be made in writing to the party liable within a reasonable time of the first observance of such damage and not later than the final payment, except as expressly stipulated otherwise in the case of faulty work or materials, and shall be adjudged by agreement or arbitration.

It is argued that the letters sent by the Bank's counsel on October 26 and 27, 1977, to Cann and B.E.C. fail to comply with the provisions of article 31.

The letters sent to Cann and B.E.C. were identical. Therein defendants were notified that it was the Bank's position that the south wall was erected contrary to the plans. The letter further advised that redress would be sought from the parties responsible. Prior and subsequent to the letters, B.E.C. representatives met with the

Bank, the Brown Co., and Glaus–Pyle and were shown the conditions on the south wall.

It was not until September, 1977, that Glaus–Pyle first inspected the south wall and recommended that some of the granite panels be removed to uncover the underlying supporting steel structure. In October, the Brown Co. removed a number of granite pieces and the suspicions that the south wall had been improperly erected were confirmed.

■■■ The assertion that the October letters fail to constitute the requisite timely written notice is without support.[12] Defendants received both written and actual notice of the problems that had surfaced on the south wall. The nature of the notice required depends on the terms of the contract. 41 Ohio Jur.2d *Notice* § 36 (1960). Under article 31 of the general conditions of contract, defendants bargained for and received a "claim ... in writing to the party liable within a reasonable time of first observance."

Article 20 of the general conditions provides:

> CORRECTION OF THE WORK AFTER SUBSTANTIAL COMPLETION
>
> The Contractor shall remedy any defects due to faulty materials or workmanship and pay for any damage to other work resulting therefrom, which shall appear within a period of one year from the date of Substantial Completion as defined in these General Conditions, and in accordance with the terms of any special guarantees provided in the Contract. The Owner shall give notice of observed defects with reasonable promptness. All questions arising under this Article shall be decided by the Architect subject to arbitration, notwithstanding final payment.

It is argued that the provisions of articles 20 and 31 create a one–year limitation period that operates as a bar to plaintiff's claims.

---

**12.** Moreover, it is important to note that this affirmative defense was never pled by defendants. *See* Fed.R.Civ.P. 8(c).

These provisions, however, merely establish a specific contractual duty and corresponding right to rectify such defects for a period of one year. They neither state an exclusive remedy nor limit the plaintiff from claiming damages as the result of faulty work or materials. *See e. g., Baker–Crow Construction Co. v. Hames Electric, Inc.*, 566 P.2d 153 (Okl.App.1977); *Board of Regents v. Wilson*, 27 Ill.App.3d 26, 326 N.E.2d 216 (1975); American Institute of Architects, 1 *Architect's Handbook of Professional Practice*, ch. 13, at 21 (1973); W. Parker & F. Adams, *The A.I.A. Standard Contract Forms and the Law* 38–39 (1954); *J. Sweet, Legal Aspects of Architectural Engineering and the Construction Process* 664–666 (West 1970).[13] Therefore, the provisions of articles 20 and 31 do not act as a bar to the claims asserted herein by plaintiff.

Defendant Cann seeks to estop the Bank from asserting any claim against him by appealing to principles of equity. In short, defendant Cann's argument is that it would be unfair to hold Cann liable for alleged contractual breach by his local architect Cassidy when Cassidy was foisted upon Cann by the Bank. The merits of the equitable estoppel theory diminish under close analysis for lack of factual support.

The parties to the instant action are large commercial enterprises. Their relationship does not indicate that the Bank was in a position that would enable it to overreach in the bargaining process.

Also, it was the common practice of Cann to employ a local architect on jobs the size of the Bank project. Due to the aesthetic nature of architectural services it is not surprising that the Bank would express a preference for Cann retaining Cassidy. Coordination of the Bank's remodeling project, and Cassidy's long standing experience with the Bank and City government also made Cassidy an attractive choice to Cann.[14]

A. *Plaintiff's Contract Claims.*

The Bank asserts a number of claims against defendants Cann and B.E.C. for breach of contract.[15] It is the duty of the Court to construe the contract documents in their entirety so as to give effect to the intention of the parties.[16] *See Skivolocki v. East Ohio Gas Co.*, 38 Ohio St.2d 244, 313 N.E.2d 374 (1974); *Ohio State Life Ins. Co. v. Clark*, 274 F.2d 771 (6th Cir. 1960). The several parts of a contract must be construed together so that the intent may be properly identified from a consideration of the whole contract. *See London Guarantee*

---

**13.** There is a minority view that such provisions operate as a complete bar to claims asserted after the one-year limitation period. *See Independent Consolidated School District No. 24 v. Carlstrom*, 277 Minn. 117, 151 N.W.2d 784 (Minn.1967); *Richmond Redevelopment & Housing Authority v. Laburnum Construction Corp.*, 195 Va. 827, 80 S.E.2d 574 (Va.App. 1954). The Ohio courts apparently have not spoken on the issue.

This Court is unpersuaded by the minority view and adopts the interpretation urged in W. Parker & F. Adams, *The A.I.A. Standard Contract Forms and the Law* 38–39 (1954): "It seems more reasonable to interpret the provision requiring correction of defects appearing within a year as constituting a specific contractual liability that would be covered by a guarantee bond which would cease to be in effect long before the end of the period established by the statute of limitations." Sound reasoning supports the interpretation of article 20 as constituting a specific contractual liability: The permanent nature of construction work "requires 'specific performance' by the Contractor

since money damages often are not an adequate substitute for the actual correction of such work." American Institute of Architects, 1 *Architect's Handbook of Professional Practice*, Ch. 13, at 21 (1973).

**14.** It is also important to note that the owner-architect agreement was executed five months prior to the letter from Cann to Cassidy proposing an association.

**15.** In count VI of the amended complaint the Bank, as a third party beneficiary, asserts a breach of contract claim against Angelo Arconti & Son, Inc. This claim has not been pursued by the Bank. The Court notes that no evidence of contractual breach was presented, and finds that the claim is without substance.

**16.** With the exception of the Cann–Cassidy association, there was no presentation at trial of extrinsic evidence that would affect or control the construction of the contract documents. Thus, the Court's interpretation is based solely upon the face of the contract documents.

& Accident Co. v. Empire Plow Co., 115 Ohio St. 684, 155 N.E. 382 (1927); Pavlik v. Consolidation Coal Co., 456 F.2d 378 (6th Cir. 1972).

 Similarly, whether the contractual duties are joint, several, or joint and several depends upon the proper interpretation of the contract rendered. See 18 Ohio Jur. 3d Contracts § 175 (1980). The relationship between architect Cann and construction manager B.E.C., as well as their mutual interest in the remodeling project, leads the Court to conclude that defendants jointly bound themselves under the contract documents. See id. § 174. Also, judgment may jointly be rendered against defendants who go to trial upon a joint answer. See Crane Township v. Secoy, 103 Ohio St. 258, 132 N.E. 851 (1921).

### 1. Cann's Contractual Duties

Plaintiff sets out in the amended complaint three separate claims against Cann for breach of contract. First, the Bank alleges that Cann failed to inspect the project for compliance with the plans and breached article 3.4.3 of the owner–architect agreement. Second, the Bank alleges that Cann breached an express warranty made in article 3.4.3 that the quality of the work is in accordance with the plans. Finally, the Bank alleges that Cann breached the contract documents by failing to provide adequate specifications for the installation of caulking and weep holes.

Article 38 of the general conditions of contract provides in relevant part:

ARCHITECT'S STATUS: ARCHITECT'S SUPERVISION

The Architect shall be the Owner's representative during the construction period. The Architect will make periodic visits to the site to familiarize himself generally with the progress and quality of the work and to determine in general if the work is proceeding in accordance with the Contract Documents. He will not be required to make exhaustive or continuous on–site inspections to check the quality or quantity of the work and he will not be responsible for the Contractor's failure to carry out the construction work in accordance with the Contract Documents. During such visits and on the basis of his observations while at the site, he will keep the Owner informed of the progress of the work, will endeavor to guard the Owner against defects and deficiencies in the work of Contractors, and he may condemn work as failing to conform to the Contract Documents.

Article 3.4.3 of the agreement between the Bank and Cann for architectural services similarly provides in relevant part:

[The Architect] will make periodic visits to the site to familiarize himself generally with the progress and quality of the work and to determine in general if the work is proceeding in accordance with the Contract Documents. He will not be required to make exhaustive or continuous on–site inspections to check the quality or quantity of the work and he will not be responsible for the Contractors' failure to carry out the construction work in accordance with the Contract Documents. During such visits and on the basis of his observations while at the site, he will keep the Owner informed of the progress of the work, will endeavor to guard the Owner against defects and deficiencies in the work of Contractors, and he may condemn work as failing to conform to the Contract Documents. Based on such observations and the Contractors' Applications for Payment, he will determine the amount owing to the Contractor and will issue Certificates for Payment in such amounts. These Certificates will constitute a representation to the Owner, based on such observations and the data comprising the Application for Payment, that the work has progressed to the point indicated. By issuing a Certificate for Payment, the Architect will also represent to the Owner that, to the best of his knowledge, information and belief based on what his observations have revealed, the quality of the work is in accordance with the Contract Documents. He will conduct inspections to determine the dates of substantial and final comple-

tion and issue a final Certificate for Payment.

In support of its claim that Cann breached article 3.4.3, the Bank contends that there existed on the part of Cann a contractual duty to conduct on–site job inspections, and that such inspections would have uncovered the variations from the plans that occurred during construction.

Article 38 of the general conditions of contract and article 3.4.3 of the architectural agreement are harmonious on the nature and extent of Cann's duty to observe generally the progress of the work. Under these provisions, Cann is obliged to act as the Bank's representative. The nature of this obligation includes keeping the project under general observation.

One purpose circumscribing the architect's duty to keep the project under general observation is to provide a basis upon which the architect can determine whether to issue the certificate of payment. Thus, periodic visits are required and the architect has the duty to observe generally the progress of work and to insure that the contractor is compensated for the amount of work completed. It is also apparent that the architect represents the owner in protecting the owner's aesthetic interests in the quality of the work and is under a duty to endeavor to guard the owner's interests.

The contract documents further circumscribe the architect's duty to keep the project under general observation. Articles 38 and 3.4.3 specifically provide that the architect is not required to make continuous on–site inspections to check the quality and quantity of the work and is not responsible for the contractor's failure to complete the work in accordance with the plans. That article 3.4.3 provides that the owner may contract for more extensive on–site representation further supports this construction.

■ Other than reference to the broad guideposts of establishing a basis for issuing certificates for payment and guarding the owner's interests, the scope of the architect's duty generally to observe is not clearly defined. Admittedly, the contract documents are explicit on the provision that

exhaustive, continuous on–site inspections are not required. That exhaustive, continuous on–site inspections were not required, however, does not allow the architect to close his eyes on the construction site, refrain from engaging in any inspection procedure whatsoever, and then disclaim liability for construction defects that even the most perfunctory monitoring would have prevented. Even the most general supervision would have placed Cann on notice as to the activities of laborers engaging in unauthorized, extensive welding and cutting of structural steel.

Turning to principles of contract interpretation, the Court construes Cann's duty under article 3.4.3 to include inspections and monitoring of a nature that would have uncovered the vast majority of defective conditions on the south wall.

■ If their terms are less than clear, contracts are generally construed in favor of the promisee and against the promissor. *See Webster v. Dwelling House Insurance Co.*, 53 Ohio St. 558, 42 N.E. 546 (1895) (syllabus ¶ 4). It is fundamental that if a provision is ambiguous it is construed strictly against the author of the contract. *See* 18 Ohio Jur.3d *Contracts* § 149 (1980). Cann is both the promisee and author of the architect agreement. Thus, the duty of general supervision clause must be construed in favor of the Bank and against Cann.

But it is not solely upon these principles that the Court rests its interpretation of Cann's duty under article 3.4.3. Indeed, elevation of these general principles to the level of categorical rules would work the unequitable result of giving a windfall to the promisee who did not draft the contract but nonetheless executed an ambiguous agreement in an arms length transaction. There are more compelling reasons supporting the Court's interpretation.

■ Apparently conflicting clauses are reconciled in favor of the one contributing most essentially to the object of the contract. *See Ford Motor Co. v. John L. Frazier & Sons Co.*, 8 Ohio App.2d 158, 196

N.E.2d 335 (1964). The object of the contract documents taken as a whole was the completion of a remodeling project with good quality workmanship and materials. To the extent that article 3.4.3's general–supervision clause may conflict with the no–exhaustive–or–continuous–on–site–inspection clause, it is the former that was more essential to the satisfactory completion of the project under the facts of the instant case.

■ Cann represented the Bank's interests on the project. The exact nature of the architect's general supervision duties will turn on the particular facts of a case. *See Pastorelli v. Associated Engineers, Inc.,* 176 F.Supp. 159 (D.R.I.1959). Often, terms of a contract clause are implied in law to accommodate considerations of justice. *See* 18 Ohio Jur.3d *Contracts* § 147 (1980). In identifying whether Cann's duty to supervise would entail inspections sufficiently diligent to detect the defective conditions on the south wall, there are a number of relevant factors that must be considered. *See* J. Sweet, *supra* at 126–27.

Cann's employment relationship with B.E.C. and their potential conflict of interest as architect and contractor on the Bank job placed a high duty upon the architect to insure that the work was proceeding as planned. The Bank project involved large architectural fees and construction costs. These costs justified a greater supervisory role than would be required on a small, less costly job. The Bank project was remodeling construction, and thus Cann was aware that the approval of variances would be required to meet existing job conditions. With regard to the frequency of visits to the site, at a minimum they should have been made when the crucial step of erecting the supporting steel for the granite non–load–bearing curtain wall was undertaken. Finally, more supervision is required on a cost incentive job like the Bank project because the contractor may be more inclined to cut corners.

■ For these reasons, the Court construes Cann's duty under article 3.4.3 to include inspections and monitoring of a na-

ture that would have uncovered the defective conditions on the south wall, and finds that Cann's failure so to perform constitutes a material breach of the contract documents.

Plaintiff also contends that article 3.4.3 contains an express warranty by Cann that the quality of the remodeling work would be consistent with the plans. Plaintiff concludes that because the south wall was found to have been constructed contrary to the plans, Cann has breached his express warranty. The provisions of article 3.4.3 support the construction offered by plaintiff.

Article 3.4.3 provides that the architect, upon observation and the data provided, will issue a certificate of payment to the contractor representing to the owner that the work has progressed to the point indicated. By issuing the certificate of payment the architect also represents to the owner that to the best of his knowledge, information, and belief, the quality of the work is consistent with the plans. Thus, Cann warrants only that to the best of his knowledge the quality of the work is consistent with the plans.

■ In light of the fact that Cann failed to perform his supervision duties adequately, the warranty that the quality of the work was consistent with the plans was not to the best of Cann's knowledge, information and belief, and thus constituted a material breach of article 3.4.3. Even the most cursory discharge of the supervisory duties would at least have given notice of the unauthorized welding and cutting of structural steel on the south wall.

■ With respect to plaintiff's contract claim resting upon the allegation that adequate caulking and weep hole specifications were not provided, it is important to note that the Bank asserts that Cann negligently failed to provide adequate specifications and thus breached the contract documents. But negligence does not enter into the analysis: the standard for breach of contract does not look to fault on the part of the promissor. Rather, the standard is whether

the promisee has received less than he bargained for, and the measure of damages is tailored to compensate for any loss on the value of the bargain. *See generally* Farnsworth, *Legal Remedies for Breach of Contract*, 70 Col.L.Rev. 1145 (1970). "If a contract is broken the measure of damages generally is the same, whatever the cause of the breach." *Globe Refining Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 544, 23 S.Ct. 754, 755, 47 L.Ed. 1171 (1903).

Plaintiff fails to pursue this claim beyond mere allegation in the amended complaint. Adequate caulking specifications were supplied by Cann in providing that installation follow the manufacturer's recommendations. There is neither any express nor implied term, supportable from the relevant contract documents taken as a whole, that would obligate Cann to specify the installation of weep holes for ventilation. Thus, the claim is without merit.

### 2. B.E.C.'s Contractual Duties

Plaintiff asserts two claims against B.E.C. for breach of contract.[17] Paragraph 5 of the management agreement requires that the construction manager must secure approval from the owner for changes in the work as originally planned.

Paragraph 10 provides that B.E.C. "shall act promptly to establish a work program under which the project will proceed with all possible speed consistent with reasonable cost, good workmanship and safety." Under article 9 of the general conditions of contract, B.E.C. is obligated to provide workmanship and materials of good quality. Under article 36, B.E.C. is responsible for the acts or omissions of its employees and subcontractors.

As fully set out above, there were substantial, unapproved deviations from the

drawings and specifications governing the erection of the granite facing on the south wall. Among the unacceptable deviations from the plans are the following: failure to install the caulking properly, omission of the stainless steel flashing and shelf angles for the return pieces of granite, the use of structurally inadequate retaining devices for the granite panels, improper erection of the supporting steel, unauthorized welding and cutting of structural steel, failure to fill the holes in the existing terra cotta wall for the stub beam connections, and the lack of bent plate steel straps to retain the block wall at the east elevation in its place. For these reasons, the granite facing as erected was structurally unsound and not of good workmanship or quality. These conditions constitute a substantial breach of the contract documents. Thus, B.E.C. is liable to the Bank for breach of contract.

### B. *Plaintiff's Tort Claims.*

There is no clear, bright line between a claim bottomed in tort and one bottomed in contract. *See* W. Prosser, *The Borderline of Tort and Contract*, in *Selected Topics in the Law of Torts* 380 (1953). It is not surprising to find therefore that it is no small task to demarcate the two theories of recovery under Ohio law.

Where the essence of a claim is to seek recovery for the value of a contract, the gravamen of the complaint is breach of contract. *Ketcham v. Miller*, 104 Ohio St. 372, 136 N.E. 145 (1922). As the Sixth Circuit has noted in interpreting Ohio law on this point:

[W]hen the promisee's injury consists merely of the loss of his bargain, no tort claim arises because the duty of the promissor to fulfill the term of the bargain arises only from the contract. The tort liability of parties to a contract

---

**17.** More specifically, counts IV and V allege that B.E.C. breached paragraphs 1, 5, 10, and 12 of the management agreement. Plaintiff also asserts through trial briefs that B.E.C. breached articles 9 and 36 of the management agreement. The drawings and specifications are specifically incorporated into the contract documents under article 1 of the general conditions of the contract, and paragraph 1 of the management agreement. *See Krause v. Oscar Daniels Co.*, 61 Ohio App. 337, 22 N.E.2d 544 (1939); 18 Ohio Jur.3d *Contracts* § 172 (1980). Paragraph 12 of the management agreement is an indemnity provision for any personal or property damage arising out of the negligence of the contractor or subcontractors.

arises from the breach of some positive legal duty imposed by law because of the relationship of the parties, rather than from a mere omission to perform a contractual obligation.

*Battista v. Lebanon Trotting Ass'n*, 538 F.2d 111, 117 (6th Cir. 1976).

By this Court's Order of June 14, 1979, the negligence claims by the Bank against Cann were dismissed. A number of negligence claims were subsequently reasserted in plaintiff's amended complaint. Under the present posture of the case, although the source of the duty allegedly breached is unclear, the claims seek damages from Cann outside the value of the contract for architectural services. To the extent that these claims may be supportable under Ohio law as alleging tortious conduct, their merit shall be adjudicated under traditional tort principles.

1. *Cann's Duty to Exercise Reasonable, Ordinary Care.*

An architect is under a duty to his employer to use the skill and diligence that is ordinarily exercised by architects. Thus, an architect does not guarantee a perfect plan but is liable only for a failure to exercise reasonable care and diligence exercised by one in the profession. *See* 11 Ohio Jur.3d *Businesses and Occupations* § 104 (1980).

Plaintiff's amended complaint sets out three counts alleging tortious conduct by Cann. Plaintiff's claims asserted in counts II and VIII closely track each other and shall be treated together. Therein, the Bank asserts that Cann was negligent in his duty to supervise the project and thus failed to discover the problems underlying the south wall. No evidence was presented, however, establishing what scope of supervision the professional standard demanded. Thus, it is not possible to conclude that Cann was under a positive legal duty imposed by law to supervise the project in such a manner that the problems would have been discovered.

Plaintiff also asserts that Cann negligently failed to specify that a bond breaker should be used in installing the caulking on the south wall.[18] This claim lacks factual support as the plans called for the use of one of two types of sealant to be installed in accordance with the manufacturer's recommendations. Both manufacturers recommended the use of a bond breaker for the depth to which the joints on the south wall were to be raked out under the plans.

Moreover, the skill and diligence that is ordinarily exercised by architects at the time the south wall was designed would not require the specification of a bond breaker. Thus, even if Cann did not specify the use of a bond breaker, his failure to do so did not constitute a breach of the duty of reasonable care and diligence normally exercised in the profession.

Assuming arguendo that Cann negligently failed to specify a bond breaker, the breach of that duty was not a proximate cause of the damages incurred by the Bank in correcting the south wall. Proximate cause is generally defined as a natural and continuous sequence that contributes to produce the result, and without which the result could not have happened. *See The Wymer–Harris Construction Co. v. Glass*, 122 Ohio St. 398, 171 N.E. 857 (1930). The disbonded caulking was only one of a number of sources from which moisture entered the south wall. Thus, the dislodged panels and rust would have occurred had the caulking never failed. Moreover, moisture from whatever source could not even be remotely connected to the south wall's structural problems.

2. *B.E.C.'s Duty to Perform in a Workmanlike Manner.*

Plaintiff asserts in its amended complaint that B.E.C. is liable in tort for

---

**18.** Plaintiff also asserted in count X of its amended complaint that Cann was negligent in failing to specify the installation of weep holes in the south wall for ventilation. This claim was abandoned at trial.

negligently failing to discover the work variances from the plans and specifications as originally drawn. It is implied in law that a builder has a duty to perform with workmanlike skill and use proper materials. *Mitchem v. Johnson*, 7 Ohio St.2d 66, 218 N.E.2d 594 (1966). It is a contractual duty implied in law, and subsequent cases have consistently held that the duty to perform services in a workmanlike manner is founded on contract. *See Tibbs v. National Homes Construction Corp.*, 52 Ohio App.2d 281, 369 N.E.2d 1218 (1977); *Lloyd v. William Fannin Builders Inc.*, 40 Ohio App.2d 507, 320 N.E.2d 738 (1973).

Plaintiff's allegation that B.E.C. wrongfully failed to discover variances is in essence a contract claim that B.E.C. failed to perform its services in a workmanlike manner. Furthermore, the relief requested demonstrates that the claim is one bottomed in contract. Plaintiff seeks only those damages proximately caused by the alleged breach that are necessary to put the Bank in the position in which it would have been had the contract been performed as promised. Plaintiff does not seek to recover consequential damages to compensate for commercial or personal injury. Rather, the case is styled as one to protect the Bank's expectation interest by recovering the cost of the corrective work on the south wall. Therefore, there is no support in the law of torts for the negligence claim asserted in count VII of plaintiff's amended complaint. Also, this implied warranty theory improperly asserted as a tort claim is coextensive with the Bank's claim that B.E.C. breached its express warranty that the project would be completed in a good workmanlike manner, and to consider it here would be superfluous.

C. *Damages.*

The following Brown Co. invoices were paid by the Bank upon the approval of Glaus–Pyle.

```
December 12, 1977.
 Materials and Equipment $ 3,888.25
 Lucco Crane 15,817.21
 19,705.46
 5% Overhead 985.27
 Labor 18,128.58
 38,819.31
 10% Profit 3,881.93
 $42,701.24
```

```
January 23, 1978
 Materials and Equipment $ 5,729.05
 Lucco Crane 16,440.00
 22,169.05
 5% Overhead 1,108.45
 Labor 19,952.53
 43,230.03
 10% Overhead 4,323.00
 $47,553.03
```

```
February 16, 1978
 Materials and Equipment $ 4,569.64
 Lucco Crane 9,945.00
 14,514.64
 5% Overhead 725.73
 Labor 16,886.06
 32,126.43
 10% Profit 3,212.64
 $35,339.07
```

```
March 16, 1978
 Materials and Equipment $13,484.17
 Lucco Crane 12,460.00
 25,944.17
 5% Overhead 1,297.21
 Labor 14,869.84
 42,111.22
 10% Profit 4,211.12
 $46,322.34
```

```
April 15, 1978
 Materials and Equipment $ 2,030.63
 Lucco Crane 2,550.00
 4,580.63
 5% Overhead 229.03
 Labor 7,141.63
 11,951.29
 10% Profit 1,195.13
 $13,146.42
```

```
June 7, 1978
 Materials and Equipment $ 6,600.90
 Lucco Crane 7,881.00
 14,481.90
 5% Overhead 724.10
 Labor 5,125.36
 20,331.36
 10% Profit 2,033.14
 22,364.50
 Lucco idle time 2,500.00
 $24,864.50
```

The Brown Co. invoices are for a total amount of $209,926.60. Additional invoices for architectural services from Glaus–Pyle in the amount of $14,950.00, and for consulting services from North Hill Marble & Granite in the amount of $280.00 were also paid by the Bank for the corrective work on the south wall. The Bank concedes billing errors in the amount of $1,011.04. Plaintiff submits that these invoices are reflective of the reasonable costs incurred to remedy the problems with the south wall, and seeks to recover a total amount of $224,145.56 as

damages. With the exceptions discussed below, the cost to the Bank to complete the corrective work was reasonable and necessary to remedy the structural problems proximately caused by Cann and B.E.C.'s breach of contract.

▮ The appropriate measure of damages is the reasonable cost of material and labor required to place the building in the condition contemplated by the parties at the time they entered into the contract. *See Daniels v. Corey Co.*, 2 Ohio App.2d 297, 208 N.E.2d 150 (1965). The Bank is entitled to "the reasonable cost of construction and completion in accordance with the contract, if this is possible and does not involve unreasonable economic waste." *Restatement of the Law of Contracts* § 346(1)(a)(i) (1932). The management agreement contains an estimated cost of completion in the amount of $2,077,381. Thus, the cost of completing the south wall in accordance with the original plans was approximately 11% of the total project price, and did not involve unreasonable economic waste.

▮ There are two fundamental principles of damages that may limit a plaintiff's recovery: minimization and mitigation. *See* 16 Ohio Jur.2d *Damages* § 17 (1971).

▮ The principle of minimization [19] requires that one injured in his person or property, whether as the result of a tort or breach of contract, must use reasonable care to avoid loss. *See Maloney v. General Tire Sales, Inc.*, 34 Ohio App.2d 177, 296 N.E.2d 831 (1973). Defendant B.E.C. argues that the Bank did not use reasonable care to avoid loss, because it failed to maintain properly the caulking on the south wall.

▮ The Bank's south wall was kept under general observation from the ground. It is important to bear in mind that the caulking prematurely failed because a sealant other than silicone was applied contrary to the specifications set out in the plans. The first signs of caulking failure were observed in the Fall of 1976. The tuck pointing job was let out to bid in the Spring of 1977, and work began in the Summer of 1977. There is no caulking maintenance or inspection procedure mentioned in the project manuals provided to the Bank by B.E.C. Under these circumstances, it is clear that the Bank exercised reasonable, ordinary care relative to maintaining the caulking on the south wall.

▮ Moreover, any lack of care on the part of the Bank did not result in avoidable loss. In the instant case, it is B.E.C.'s contention that the Bank's failure to maintain the caulking allowed moisture to collect on the shelf angles, rust the structural steel, freeze and dislodge the granite panels. But moisture will inevitably enter the cavity of any curtain wall. Also, B.E.C.'s failure to install the steel flashing allowed considerable moisture to enter the cavity of the wall.

The moisture that entered the cavity from a number of sources only set in motion the chain of events that led to the discovery of the defects in the south wall. The failure to apply a field coat of primer to cover those portions of the structural steel's shop coat that had been damaged by cutting or welding was the primary cause of the rust problem. In fact, the rust problem would not have occurred but for the failure to apply a field coat of primer where necessary. Similarly, it is unlikely that sufficient moisture would have collected on the shelf angles, without the sponge effect created by the excess mortar buildup, so as to cause the panels to dislodge under the thermal forces generated by freezing temperatures.

It was during the attempt to reposition the dislodged granite panels that the dangerous structural problems underlying the south wall were first discovered. It was with all reasonable care that the Bank pro-

---

**19.** The principle of minimization also commonly referred to as the avoidable consequences rule. It should not be confused with the affirmative defense of contributory negligence. The avoidable consequences rule applies to both negligence and contract cases. Contributory negligence focuses upon the plaintiff's pre–tort conduct, while the avoidable consequences rule looks to the plaintiff's post–tort or post breach conduct. *See* D. Dobbs, *Remedies* 187 (1973).

ceeded to maintain the failing caulking. Also, B.E.C.'s contention that the Bank failed to exercise reasonable care overlooks the glaring fact that no act or omission on the part of the Bank even remotely contributed to the defective condition in which the south wall was erected.

The principle of mitigation of damages allows the defendant to reduce the amount of damages for which he is liable by showing extenuating facts or circumstances. *See* 16 Ohio J.2d (Rev.) *Damages* § 121 (1971). In the instant case B.E.C. argues that the damages should be reduced because the corrective work could have been done at a lower cost.

Hilton authorized the Brown Co. to work overtime on a number of days. The corrective work on the Bank's south wall could have been completed within the same time period without the authorization of overtime wages. Although the overtime hourly rate was excessive, the work was proper and necessary. Thus, the overtime wages authorized shall be reduced by the amount that they exceed the regular hourly rate plus the Brown Co.'s 10% profit margin: $8,473.53.[20]

The Bank retained the engineering services of Glaus–Pyle for a fee of $14,950.00. B.E.C. offered to provide all engineering services to the Bank for the corrective work at no charge. The Bank refused B.E.C.'s offer solely because Hilton summarily viewed it as unacceptable. No other reason for Hilton's refusal of the B.E.C. offer is given. Thus, plaintiff's damages shall be reduced by $14,950.00.

The rental of the Lucco 75 ton crane was one of the most expensive aspects of the corrective job. Still, it was not established at trial that a smaller crane would have sufficed, or even that a smaller crane would -have been any less expensive. There was a charge of $2,500.00 for the month that the Lucco crane sat idle. But due to the preparations that had to be made for its placement, the decision to leave it remain idle rather than move it back and forth was a reasonable one.

Thus, the amount of damages defendant B.E.C. is liable for shall be reduced by $23,423.53.

### III. CONCLUSION

Accordingly, based upon the foregoing, the Court hereby finds that defendants Cann and B.E.C. are not liable in tort to plaintiff, and further finds that defendants Cann and B.E.C. are jointly and severally liable for breach of contract to plaintiff in the amount of $200,722.03.

IT IS SO ORDERED.

---

**20.** This figure was reached by calculating the amount of overtime paid in excess of the regular hourly wage. The 10% profit margin was then taken into account in arriving at the total excess wages billed to the Bank. The amount of overtime wages paid was taken from plaintiff's exhibits nos. 50, 53, 57, and 59.