SOUTH UNION, LTD., APPELLEE AND CROSS-APPELLANT, *v.* GEORGE PARKER & ASSOCIATES, AIA, INC. ET AL., APPELLANTS AND CROSS-APPELLEES.

(No. 85AP-73 — Decided
November 14, 1985.)

*Schottenstein, Zox & Dunn, Gary D. Greenwald* and *Deborah S. Solove,* for appellee and cross-appellant.

*Teaford, Rich & Dorsey, Hamilton J. Teaford* and *Craig P. Treneff,* for appellants and cross-appellees.

BROGAN, J. This case arises out of a complaint in contract and negligence filed on April 8, 1983 in the Court of Common Pleas of Franklin County by South Union, Ltd. ("appellee" or "South Union"), a Pennsylvania limited partnership, against George Parker & Associates, AIA, Inc. ("appellant" or "Associates"), an Ohio professional architectural corporation. South Union subsequently amended its complaint to include the principal of Associates, George Parker ("Parker"), as a defendant. The basis of South Union's com-

plaint concerned the defective construction of a seventy-unit government-subsidized apartment complex in Uniontown, Pennsylvania, known as Surrey Hill. Specifically, the complaint charged appellants, as inspecting architects of Surrey Hill, with: (1) active misrepresentations and an unauthorized change in the electrical system combined with defective installation of that system, and (2) serious deficiencies in the paving specifications combined with a failure to inspect and test the paving at critical stages.

Appellants' answer denied any liability and raised various defenses. Appellants also counterclaimed for money due on a contract entered into with South Union for professional architectural services rendered in connection with the Surrey Hill project.

The parties waived their right to a jury trial and the matter was heard before a referee beginning on September 4, 1984. On December 3, 1984, the referee filed extensive findings of fact and conclusions of law. The referee recommended a finding in favor of South Union in the sum of $207,416 for breach of contract and negligence. However, the referee determined that the latter sum should be set off by $57,100: $11,100 for appellants' counterclaim and $46,000 for a settlement appellee received from a third party.

On December 17, 1984, appellants filed objections to the referee's report. The objections were overruled by the trial court's judgment entry of January 16, 1985, which adopted the referee's report in its entirety. Appellants' notice of appeal followed on January 30, 1985 and, on February 15, 1985, South Union filed a cross-appeal. The cross-appeal by South Union concerned the $57,100 set-off.

As the facts of this case are largely undisputed, a brief summary of the events at Surrey Hill will suffice. We draw the following facts from the referee's report.

South Union was granted approval by the United States Department of Housing and Urban Development ("HUD") in 1977 to build Surrey Hill. In August of the same year, South Union entered into a construction contract with Prime Builders of Pennsylvania, Inc. ("Prime Builders") to build Surrey Hill. The principals of Prime Builders were Lawrence Maxwell ("Maxwell") and Charles Erdman. Maxwell and Prime Builders were also the managing general partners of South Union. Prime Builders was therefore wearing two hats: it was managing general partner of South Union and South Union's general contractor for Surrey Hill.

After one year as general contractor for Surrey Hill, Prime Builders encountered financial difficulties. As a result, Prime Builders ceased construction at Surrey Hill in August 1978. Between August 1978 and August 1979, Index Developing Company ("Index") became the unofficial general partner of South Union and was denominated "construction manager" for purposes of construction draws and liaison with subcontractors. Robert Hardy ("Hardy") was the sole owner of Index. In March 1979, Hardy and Index became official general partners of South Union replacing Maxwell and Prime Builders.

On August 29, 1979, South Union entered into a second construction contract with Eller Enterprises, Inc. ("Eller"). Eller remained the general contractor at Surrey Hill until its completion in early 1980.

Extensive plans and specifications ("plans and specs") were provided to the general contractors and incorporated into the construction contracts. The contractors were expected to adhere to the plans and specs. Any material deviation required a written change order. Change orders had to be submitted to and approved by South Union, HUD, the lender and the inspecting architect. A material deviation from the plans and specs was described as a significant change in the cost, time or design of the project. However, it was not unusual for such changes to occur when the principals agreed to a particular change.

Surrey Hill was designed by the architectural firm of Real Estate Planning Company, Inc. ("Real Estate"). Real Estate was a creation of Prime Builders, which in turn allowed Prime Builders to collect part of the design fee for projects it processed.

Associates, through its principal, George Parker, executed a series of contracts (owner-architect contracts) with South Union and became the inspecting architect for Surrey Hill. The referee summarized Associates' responsibilities of inspecting, as follows:

"A. Review all of the Plans and Specs for completeness and accuracy;

"B. Provide all engineering, architectural and consulting services during construction;

"C. Inspect the Project and advise the owner and HUD of any omissions, substitutions, defects and deficiencies;

"D. Visit the Project as often as the nature and progress of the work and the interests of the owner and HUD require;

"E. Determine whether the work complied with the Plans and Specs; and

"F. Certify to the Owner, the lender and HUD upon completion of construction that the work had been completed according to the terms and conditions of the contract documents."

As indicated in (F) above, upon completion of Surrey Hill, Associates was required to submit what is called a "Certificate of Substantial Completion" to South Union, HUD and the lender. Two additional inspections were to follow: one within twelve months to check for latent defects and a final inspection at the end of the twelve months to insure that any latent defects previously discovered had been cured.

Construction at Surrey Hill was completed by Eller in February 1980. On February 15, 1980, Associates submit-

ted its Certificate of Substantial Completion. The second guarantee inspection was submitted on May 13, 1981. The latter inspection noted various deficiencies in the paving connected with Surrey Hill; however, the inspection did not mention any possible problems with the overall design or construction of the road, the subgrade or subbase. It was also reported for the first time that the electrical system did not conform to plans and specs. The deviation was not noted as a latent defect nor was there any indication that the general contractor had been notified.

The electrical work which was in controversy in this case was detailed by the referee in his findings of fact as follows:

"A. The 'meter centers,' which are installed on the outside end walls of each of the eight unit apartment buildings and on one end wall of the six unit apartment building; and

"B. The four circuit breakers which are installed in each of the sixteen (16) meter centers on the 8-unit buildings and the six circuit breakers which are installed in the one meter center on the six unit building; and

"C. The service entrance cable which runs inside the walls from the outside meter centers to the panel boxes in each of the apartments. * * *

"87. The plans required the meter centers to be capable of receiving 125 amperage outside circuit breakers (hereinafter '125 amp breakers') and required the installation of 125 amp breakers in each meter center. * * * The plans also specified the installation of #10 ('one-aught') size aluminum service entrance cable (hereinafter '1/0 wire') from the meter centers to the panel boxes. * * *

"88. It is undisputed that the meter centers which were installed were not capable of receiving 125 amp breakers, that the outside breakers which were installed were 100 amp breakers and that the service entrance cable which was in-

stalled was # 2 size aluminum wire ('# 2 wire')."

The referee also found that:

"89. A change in the electrical system from 125 amp breakers to 100 amp breakers is a material change which would require a change order. * * *

"90. A change in the electrical system from service entrance cable of 1/0 wire size to #2 wire size is a material change which would normally require a change order. * * *"

In his conclusions of law, the referee found that Parker's and Associates' Certificate of Substantial Completion was made without "reasonable and adequate inspections." Consequently, the referee concluded, Parker and Associates were responsible for the deviations in the electrical system.

With respect to the paving deficiencies, the referee concluded that: (1) Parker and Associates failed to review the paving specs "and therefore failed to recognize and resolve the ambiguities, omissions and deficiencies in the pavement design," and (2) that Parker and Associates failed to make adequate inspections or to determine whether testing was required and to accurately report defects and deficiencies. Following the trial court's approval of the referee's findings of fact and conclusions of law, this appeal followed.

The parties to this appeal have raised collectively fifteen assignments of error: ten by Parker and Associates (hereinafter "appellants") and five by South Union (hereinafter "appellee" or "cross-appellant"). We begin by addressing appellants' assignments of error.

The first two assignments raised by appellants are essentially the same and shall be considered together.

Appellee's original general partner and first general contractor at Surrey Hill was Prime Builders. During Prime Builders' tenure at Surrey Hill, approximately forty-five percent of the construction was completed, including the

start of the rough electrical work. When Prime Builders folded in August 1978, Index and Bob Hardy assumed the position of "unofficial general partner and construction manager" for appellee at Surrey Hill. During the latter period, which lasted from August 1978 until August 1979, another twenty percent of the project was completed, and the rough electrical work was finished. Appellants argue that appellee's general partners (and therefore agents) were in charge of the project when the faulty electrical work was performed. Therefore, appellee was estopped from recovering damages.

It is undisputed that the electrical work was installed by one Leland F. Gigliotti ("Gigliotti"), a self-employed general contractor. Gigliotti was awarded the electrical subcontract from Prime Builders and began work at Surrey Hill in the fall of 1977. Gigliotti's relationship to Prime Builders appears to be that of an independent contractor. Although appellants allege generally that Gigliotti was an employee of Prime Builders, they have not so demonstrated. However, Gigliotti's testimony indicated that certain employees of Prime Builders were aware of the nonconforming electrical work.

Between the time Prime Builders folded and Eller became the general contractor, Hardy and his company, Index, were looking after the Surrey Hill project. Hardy testified that he was simply attempting to keep the project moving forward until he and his company could be given HUD approval. From March 1979 until July 1979, Gigliotti was acting as a superintendent for the project. However, his duties were primarily those of security. The subcontractors still on the job were not his responsibility.

Appellants argue that Gigliotti, as an agent of Hardy and Index, was aware of the nonconforming work. Therefore, the knowledge of such defects was im-

puted to appellee. Again, appellants conclude, appellee was estopped from recovering damages.

With respect to appellants' first argument, that appellee managed the project when the electrical work was installed, the referee concluded that:

"21. * * * [E]ven though the plaintiff nominally supervised construction it had no construction expertise and no knowledge, actual or constructive, of the deviation of the electrical system. Defendant and Mr. Eller testified that they believed that Mr. Hardy was aware of the changes in the electrical system. This Court, judging the credibility of the witnesses, finds that Mr. Hardy was not aware of the deviation and cannot therefore be estopped from recovering damages. It is also clear from the case law applicable that the owner was entitled to rely upon the architect to perform his duties to inspect and to report such major deviation. See *Bloomsburg Mills [, Inc.]* v. *Sordoni [Constr. Co.], supra* [(1960), 401 Pa. 358, 164 A.2d 201]."

Concerning appellants' argument that Gigliotti's knowledge of the deviations should have been imputed to appellee, the referee found that:

"22. Although the electrical contractor who deviated from the specifications was also the superintendent on the Project for a period of time, there was insufficient evidence to impute his knowledge of the deviation to plaintiff. Without an affirmative showing that the plaintiff, via its owners, was aware of and comprehended the change in the electrical service, it must be concluded that responsibility rests with defendants. Defendants failed to show any express or implied approval of the changes by plaintiff."

Initially, we note that the question of liability was decided under the laws of Pennsylvania, and the issue of damages according to Ohio law. The parties do not dispute the choice of law and we shall proceed accordingly.

Section 324 of the Pennsylvania Partnership Act provides the following:

"Notice to any partner of any matter relating to partnership affairs, and the knowledge of the partner acting in the particular matter, acquired while a partner or then present to his mind, and the knowledge of any other partner who reasonably could and should have communicated it to the acting partner, operate as notice to or knowledge of the partnership, except in the case of a fraud on the partnership committed by or with the consent of that partner." 59 Pa. Consol. Stat. Ann. Section 324 (Purdon Supp. 1985).

This section is made applicable to limited partnerships by Section 311(b) of 59 Pa. Consol. Stat. Ann. (Purdon Supp. 1985). Further, as a general rule, the law of partnerships declares that knowledge and actions of one partner are imputed to all other partners. *Engl v. Berg* (E.D. Pa. 1981), 511 F. Supp. 1146, 1154. This rule has been applied to both general and limited partnerships. *Id.*

Our review of the record satisfies us that the referee properly concluded that appellee was not estopped from recovering damages.

The referee did not specifically address the question of whether employees of Prime Builders were aware of the deviations. On this point, Gigliotti testified that Frank Peters, Joe Cozart and Doug Coffman had knowledge that the electrical work did not conform to the specs. All three were supervisors with Prime Builders. However, Cozart testified that he had no such knowledge. Peters and Coffman did not testify. Thus, we will not disturb the judgment where there is some competent, credible evidence to support it.

With respect to Hardy, the referee found that there was some conflict as to whether Hardy was aware of the electrical deviations. However, the referee concluded that "* * * [t]his Court, judg-ing the credibility of the witnesses, finds that Mr. Hardy was not aware of the deviation * * *." This finding is corroborated by competent and credible evidence and will not be disturbed. *Seasons Coal Co.* v. *Cleveland* (1984), 10 Ohio St. 3d 77, 80.

Concerning Gigliotti, the electrical subcontractor and temporary superintendent for Index, the referee concluded that "* * * there was insufficient evidence to impute his knowledge of the deviation to plaintiff. * * *" Assuming Gigliotti was truly an agent of appellee, the latter conclusion of law was incorrect. As indicated in our discussion of the law, knowledge to one partner is knowledge to all. See 59 Pa. Consol. Stat. Ann. Section 324, *supra*. Even though Index may not have been an official general partner of appellee at the time, Index was certainly representing appellee's interest at Surrey Hill.

We conclude, however, that, considering the insignificance of Gigliotti's role as a supervisor and appellants' contractual duty to advise the owner (appellee) of any departures from the plans and specs, appellee cannot be estopped from recovering damages.

On this matter, Gigliotti's testimony is revealing:

"Q. [By Appellants]: And was there a time that you had duties other than as a subcontractor on this project?

"A. [By Gigliotti]: I represented them as a superintendent for a while.

"Q. By 'them,' you mean?

"A. Well, South Union or Index Development.

"Q. Do you recall how long that was?

"A. That was about five months.
"* * *

"Q. Who hired you to have that job?

"A. At that time, I wasn't really being paid to be a superintendent. I was just looking after the job for Bob Hardy.
"* * *

"Q. What were your duties in looking after the job?

"A. Just maintained the — to see to it that they had security service there. That was in a period while it was going through a change from one ownership to another.

"Q. Were any other subs doing work on the job at that time?

"A. Yes. Yes, there was [sic] other subs on that job.

"Q. Did you have any responsibility with regard to them?

"A. Not really. Their responsibility was mainly to the *architect*, the inspector and to the HUD inspector." (Emphasis added.)

Finally, paragraph four of the owner-architect agreement entered into between appellants and appellee expressly provides that: "The Architect will advise the Owner * * * of any omissions, substitutions, defects and deficiencies noted in the work of contractors * * *." Appellants obviously failed to inform appellee of the electrical deviations. As indicated by our discussion, the facts do not allow appellants to take refuge from liability behind the doctrine of estoppel. Accordingly, appellants' first and second assignments are overruled.

Appellants' third and eighth assignments claim that appellee failed to establish through competent expert testimony the standard of care required of an inspecting architect as it pertained to the electrical work and paving at Surrey Hill.

Appellee offered the testimony of three experts: Richard Miller, George Berardi, both of whom were architects, and James Johnson. Johnson was not an architect but had extensive experience in the construction business. Appellants argue that Miller was not qualified to pass on appellants' duties as inspecting architect because Miller had no experience with HUD projects. As for Berardi, appellants maintain that he

never testified as to the applicable standard of care expected of appellants. Johnson, appellants conclude, was not an architect and therefore incompetent to render his "expert" opinion.

The referee found that appellee's expert testimony established the following:

"A. Defendants fell below the standard of care by failing to review the Plans and Specs for deficiencies and ambiguities as to the paving work;

"B. Defendants fell below the standard of care by failing to properly inspect the electrical system and report the deviation when correction could have been done before the interior walls were installed;

"C. Defendants fell below the standard of care by failing to make timely inspections of each phase of the paving work;

"D. Defendants fell below the standard of care by allowing improper construction of the pavement to proceed;

"E. Parker fell below the standard of care when he certified that the electrical system complied with Plans and Specs when that in fact was not the case."

Initially, the qualifications or competency of a witness to testify as an expert or to give his opinion on a particular subject rests with the trial court and, on appeal, its ruling with respect thereto will ordinarily not be reversed unless there is a clear showing that the court abused its discretion. *Ohio Turnpike Commission* v. *Ellis* (1955), 164 Ohio St. 377 [58 O.O. 179]. An expert witness is not required to be the best witness on a particular subject; the test is whether the witness offered as an expert will aid the trier of fact in the search for the truth. *Alexander* v. *Mt. Carmel Medical Center* (1978), 56 Ohio St. 2d 155 [10 O.O.3d 322].

The referee's finding that appellants fell below the standard of care required of an inspecting architect is amply sup-

ported by the record. Berardi testified that he had worked for appellants for a period of time as an inspecting architect. Berardi stated that it was his duty as an inspecting architect to report any deviations from plans and specs and to recommend that payment be withheld.

Richard Miller, appellee's other architect expert, testified as to his extensive professional background. Although he had never actually worked on a HUD low-income, multi-family project such as Surrey Hill, his professional experience did include nursing homes, dormitories, college classrooms, commercial buildings, federal projects, SAC underground headquarters and "a very broad practice of architecture." Miller testified at length as to what was customarily required of an inspecting architect as it concerned the paving aspect of a given project. It was Miller's professional opinion that appellants had not met the minimum standard. Having found competent expert testimony as to the standard of care required by an inspecting architect, appellants' third and eighth assignments are overruled.

Appellants' fourth assignment claims that the electrical deviations at Surrey Hill were approved by a change order dated September 24, 1979. The referee's finding to the contrary, appellants argue, was against the manifest weight of the evidence.

On September 7, 1979, a meeting was held at Surrey Hill involving Messrs. Hardy, Kincaid and Gigliotti on behalf of Index and appellee; Mr. Eller on behalf of Eller Enterprises; Mr. Andreas on behalf of HUD; and appellant George Parker. The purpose of the gathering was to facilitate the transition of general contractor from Index to Eller. The discussion at the meeting concerned deviations from the original plans and specifications. Before Eller could proceed with the construction, appropriate change orders had to be approved. As a result of a change order

dated September 24, 1979, specifically item 11, the following change was noted: "Install mini-breakers in lieu of full-size breakers to reduce panel size." Appellants claim that the latter item, which was allegedly discussed at the September 7 meeting, implied a change in amperage on the outside breakers from 125 to 100, and a change in the wire size from 1/0 to #2.

Appellee presented the testimony of Dennis deMelker, an engineer and HUD inspector; Frank Fowler, a HUD engineer; Thomas Richey, an electrical engineer; and Ed Stormont, an electrical contractor, all of whom stated that item 11 would not imply the change suggested by appellants.

The referee found that:

"The September Change Order is very specific and detailed as to most of the changes noted therein. In view of such detail, in view of the need to communicate the nature of the changes to the owner, the lender, and HUD, and in view of the substantial impact of changes in the electrical system, the Court finds that no reasonable person could have understood item 11 as changing the outside breakers from 125 amps to 100 amps nor the wire size from 1/0 size to #2 size."

Once again, our review of the record supports the referee's finding as to the September change order. Although there is some conflict, the evidence is substantial that the amperage and wire sizes were not included in item 11. Judgments supported by competent, credible evidence will not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co.* v. *Foley Construction Co.* (1978), 54 Ohio St. 2d 279 [8 O.O.3d 261]. Any conflict in testimony must be resolved by the trier of fact. *Id.* Accordingly, appellants' fourth assignment is overruled.

For their fifth assignment, appellants allege error in the referee's award of damages to appellee for the electrical

deviations. The referee's findings of fact with respect to this issue were as follows:

"111. Both of plaintiff's electrical experts testified that the only way to cure the deviation in breakers and cable would be to replace them. In respect to the cable, a soffit or conduit would have to be placed in the units to carry the new cable. The estimated cost would be One Hundred Thirty Five Thousand Three Hundred Thirty Nine Dollars ($135,339.00). See Plaintiff's Exhibit 39.

"112. To replace the existing cable by removal of the old cable would entail destruction of inner walks [*sic*] and a greatly increased cost. Another method would be outside routing of a new cable at a cost of approximately $70,000.00."

The referee's award of damages to appellee was $135,339. Appellants argue that the amount should have been the less expensive alternative of $70,000. Further, appellants point to the fact that the $70,000 figure was offered by appellee's electrical expert.

The appropriate measure of damages in this case is the reasonable cost of material and labor necessary to place the electrical work at Surrey Hill in the condition contemplated by the parties at the time they entered into the contract. See *First National Bank of Akron* v. *Cann* (N.D. Ohio 1980), 503 F. Supp. 419, 441. Appellee is entitled to " 'the reasonable cost of construction and completion in accordance with the contract, if this is possible and does not involve unreasonable economic waste.' " *Id.*, citing Restatement of the Law, Contracts (1932), Section 346(1)(a)(i).

On the issue of electrical repairs, appellee offered the testimony of two electrical experts: Thomas Richey and Edmond Stormont. Both Richey and Stormont were of the opinion that a permanent solution to the electrical problems at Surrey Hill called for replacing the meter centers, increasing the size of the outside breakers, replacing the wire into the panels and replacing the panels.

As for the wire that runs from the outside meter centers into the various units, there were several options. The option Stormont and Richey apparently believed to be the most practical was to build a soffit through the apartments. The entrance cable would then be fed through the soffit to the panel boxes. This alternative would be much less costly than to rip out the drywall (behind which the wiring is located) and replace the existing wire. Although Richey stated that a less expensive option was available, he was also of the opinion that such an alternative was "tacky."

The referee concluded that the repairs for both the electrical work and the paving were expensive but neither involved economic waste. We agree. A review of the evidence supports the referee's award of $135,339 for the electrical work. As indicated above, the law requires returning appellee to a condition contemplated by the parties at the time of contracting. *First National Bank of Akron* v. *Cann, supra.* The option most favorable to the breaching party is not always the fairest; accordingly, appellants' fifth assignment is overruled.

Appellants' sixth assignment claims error in the referee's award of $135,339 for the electrical damages. The argument advanced for this proposition is that, prior to trial, appellee settled its claim with Eller's bonding company for $46,000. Part of the latter figure was designated for the electrical work at Surrey Hill. Appellants therefore conclude that appellee has been compensated in full for all damages relating to electrical deviations at Surrey Hill. Further, appellants allege that, as concurrent tortfeasors with Eller, the release of the latter precludes appellee from recovering additional damages from appellants.

Appellants' argument concerning

the $46,000 received from Eller's bonding company ignores the fact that the entire settlement was deducted from appellee's gross award. The record indicates that only $6,000 of the settlement pertained to the electrical damages. Appellee's damages with respect to the electrical problems were established to be approximately $135,000.

Appellants' argument that they were concurrent tortfeasors with Eller is equally without merit. Assuming Eller and appellants were joint tortfeasors, appellants failed to recognize the existence of R.C. 2307.32(F)(1), which provides as follows:

"(F) When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:

"(1) It does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms otherwise provide, but it reduces the claim against the other to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater[.]"

Appellants' sixth assignment is overruled.

Appellants' seventh assignment is similar to the first two assignments, *i.e.,* estoppel. Appellants claim that the paving specifications, which the referee found to be ambiguous and deficient, were prepared by an agent of appellee's general partner. Therefore, knowledge of the ambiguities and deficiencies was imputed to the general partner and to appellee. Thus, appellee was precluded from recovering damages based on estoppel.

The paving plans were the product of Real Estate Planning Company, Inc. There was evidence to suggest that Real Estate owed its existence to Prime Builders and the referee so found:

"17. Real Estate Planning Company, Inc. was formed by Prime Buildings [*sic*] in order to enable it to receive part of the design fee for the projects it processed."

Beyond what the referee found, appellants have directed us to no additional evidence which would have us impute the knowledge of the deficient specifications to appellee. Without such a demonstration, Real Estate's separate corporate entity will not be disregarded. See *Sedgwick* v. *Kawasaki Cycleworks, Inc.* (1985), 24 Ohio App. 3d 109.

Further, to hold as appellants urge would be to close our eyes to appellants' contractual and professional obligations under the owner-architect contract.

The assignment is overruled.

Appellants' ninth assignment relates to the standard of care required of appellants as inspecting architect. Specifically, appellants claim that the referee's finding that appellants failed to make adequate inspections of the paving was against the manifest weight of the evidence. This assignment is without merit.

As indicated in our discussion in appellants' assignment three, appellee presented expert testimony as to what was expected of appellants under the owner-architect contract. Richard Miller, appellee's architect expert, testified at length as to what was normally expected of the inspecting architect on a paving operation such as Surrey Hill. Miller's opinion was based on his review of the owner-architect contract as well as his vast experience as an architect. After reviewing the various field reports relating to the paving operation and submitted by appellants, Miller was of the opinion that the field reports did not adequately document the inspection of the blacktop work. Miller's opinion was supported by substantial, credible evidence and will not be disturbed. Appellants' ninth assignment is overruled.

Appellants' last assignment states, as it did in assignment six, that the paving damages were satisfied in full by ap-

pellee's settlement with Eller's bonding company. Applying the rationale used in assignment six, we likewise reject the contention.

We now turn our attention to the issues raised by cross-appellant South Union.

The first assignment alleges that the referee erred by considering parol evidence relating to plaintiff's exhibit 13. The latter exhibit was an agreement entered into between cross-appellant and cross-appellees and reads as follows:

"SOUTH UNION, LTD. (SURREY HILL) agrees to pay to GEORGE PARKER & ASSOCIATES, INC. the sum of Nine Hundred Dollars ($900.00) per month, said sum to be paid monthly, beginning August 13, 1978, for inspection services for South Union, Ltd. (Surrey Hill), in addition to fees previously agreed upon.

"In return, GEORGE PARKER & ASSOCIATES, INC., by George Parker, President, agrees to sign the 'Request for Construction Changes — Project Mortgages', which extends the Construction Contract from August 12, 1978, to December 30, 1978."

Cross-appellant argues that the terms of the agreement are unambiguous: Parker was to sign an extension of the construction contract from August 13, 1978 until December 30, 1978. In return, Parker was to receive $900 per month for the duration of the extension. Therefore, cross-appellant concludes, cross-appellees were entitled to five months' compensation at $900 per month, or $4,500.

During George Parker's direct testimony, counsel presented his client with a copy of the agreement. Parker was then asked to explain the purpose of the agreement. This brought about an immediate objection from plaintiff based on the parol evidence rule.

The referee ruled as follows:

"THE REFEREE: You have your objection. I find if his testimony amplifies, clarifies, does not contradict, I will admit it as not being parole [*sic*]. I won't know until he answers."

The witness' explanation of the document was that:

"A. It was our agreement that the $21,156 dollar contract [plaintiff's exhibit 11] was being recognized, and that in addition to that amount of money I would receive $900 per month beginning August 13, 1978 and continuing until the project was complete."

Plaintiff again registered a strong objection. However, the matter was laid to rest by the referee's final ruling:

"Well, I find that there is ample room for interpretation of this contract, to-wit, the statement: 'in addition to fees previously agreed upon.'

"There is no statement that these two paragraphs are necessarily inclusive of one another, and whether the credibility of the witness will be such that I determine that all he says is true or not will rest upon me as the trier of fact. But I will let the testimony proceed in this area and I will take it for what value it's worth, and we will note your objection for the record to the testimony in this regard. You may proceed."

As a general rule, parol testimony of prior or contemporaneous oral agreements which would contradict or vary the terms of a valid written contract is incompetent, in the absence of fraud. *Florence* v. *Tri-State S. & L. Co.* (App. 1974), 68 O.O. 2d 146, 148. The purpose of the parol evidence rule is not to exclude all extrinsic evidence in general, but, rather, to exclude only such evidence intended to supersede and destroy the clear intentions of the parties set forth in the written agreement. *Id.*

Our review of appellee's exhibit 13 satisfies this court that the referee did not commit error by allowing Parker to explain the purpose of the agreement. The two paragraphs of the contract appear to be exclusive of one another. It is not plain, as cross-appellant suggests, that Parker was to be paid only from August 1978 until December 1978. Nor

was the document precise as to the phrase in paragraph one: "* * * in addition to fees previously agreed upon." Accordingly, cross-appellant's first assignment is overruled.

Cross-appellant's second assignment alleges that cross-appellees failed to substantiate their contention that cross-appellees were owed $11,100 under Parker contract No. 3 (plaintiff's exhibit 13; see cross-appellant's first assignment).

As cross-appellant recognizes in its brief, the standard for reversing a judgment as being against the manifest weight of the evidence is difficult to meet. Judgments supported by some competent, credible evidence will not be reversed except as a matter of law. *C. E. Morris Co.* v. *Foley Construction Co., supra.*

The evidence presented by cross-appellees to substantiate their counter-claim of $11,100 for architectural services rendered under the owner-architect agreement (plaintiff's exhibit 13) consisted of George Parker's testimony and defendants' exhibits A and D. The latter two documents were summary invoices prepared personally by George Parker. Parker averred that the invoices accurately reflected the services rendered and money payable from cross-appellant. This evidence, if believed by the trier of fact, was sufficient to support the referee's award of $11,100 to cross-appellees. The second assignment is overruled.

Cross-appellant's third assignment attacks the referee's setoff of $46,000 as being contrary to law.

As indicated above, the $46,000 settlement cross-appellant received was from *Eller,* the general contractor, for damages relating to breaches of the construction contract at Surrey Hill. With respect to this settlement, the referee concluded as follows:

"24. Plaintiff and defendants offered two different calculations of the amount available as a set-off in this ac-tion from the recovery in the companion *Eller case.* The finding of fact as to a proper set-off with respect to tort is based upon R.C. § 2307.32(F)(1). It is hereby concluded that the proper figure that should be utilized in apportioning damages that have been paid by another defendant in another action for the same causes asserted herein is $46,000.00. It is recognized that claims other than electrical and paving were asserted in *Eller,* however this Referee has no credible way to determine an allocation for those.

"25. It is concluded that on a breach of contract basis, plaintiff would be unjustly enriched if no adjustment to recovery is made for the *Eller* settlement. The only undisputed figure that is available is $46,000.00. This Referee concludes that the above-figure is appropriate as a set-off despite oral testimony that the entire settlement included claims other than electrical and paving."

We conclude that the proper disposition of the $46,000 should have been based on unjust enrichment. "It has been said that one is unjustly enriched if the retention of a benefit would be unjust * * *." 18 Ohio Jurisprudence 3d (1980) 269, Contracts, Section 343. The evidence indicates that the settlement between cross-appellant and Eller included repairs for the electrical work and paving. According to cross-appellant's trial attorney, Gary D. Greenwald, the particulars of the settlement were broken down as follows:

| | |
|---|---|
| $ 6,000.00 | Electrical |
| 75,000.00 | Paving |
| 4,165.00 | Grading |
| 3,500.00 | Landscaping |
| 13,720.00 | Brick and Concrete |
| 3,200.00 | Punch List Items |
| + 13,568.32 | Mechanic's Lien |
| $119,153.32 | |
| − 10,100.00 | Set-off for money due Eller on construction contract. |
| $109,053.32 | Total Damages |

The referee concluded that there was no credible way to allocate the damages. However, based on Greenwald's testimony, we have reduced the setoff from $46,000 to $34,000. We reach this figure by way of the following reasoning.

Cross-appellant's damages resulting from Eller's construction contract breaches totaled $109,053.32. Of the latter figure, approximately seventy-four percent pertained to paving and electric ($6,000 electric, $75,000 paving). The remaining twenty-six percent was for damages unrelated to cross-appellant's claims against cross-appellees, i.e., landscaping, brick and concrete, etc. Therefore, twenty-six percent of $46,000, or $12,000, will be awarded to cross-appellant.

The final two assignments, which cross-appellant has combined, alleges error in the referee's failure to fully compensate cross-appellant for damages suffered as a result of cross-appellees' negligence. Particularly, our attention is directed to the record wherein competent evidence of diagnostic expenditures was presented by cross-appellant.

With respect to the electrical damages, cross-appellant cites two items: $450 for replacement of circuit breakers at Surrey Hill and $845.60 for architectural and engineering services in connection with the electrical deficiencies at Surrey Hill. Both items were documented and corroborated by testimony. However, although the $845.60 was recognized in the referee's report, the expense was not awarded. As for the $450 for circuit breakers, the referee made no finding of fact.

With respect to the paving, cross-appellant again directs our attention to two items. The record indicates that cross-appellant retained the services of CTL Engineering, Inc. to assess the extent of the paving damages and to seek CTL's recommendation for permanent repair. Two investigations were undertaken by CTL at a total cost of $7,124.

As we indicated in appellants/cross-appellees' fifth assignment of error, cross-appellant is entitled to the reasonable cost of construction and completion in accordance with the contract, if this is possible and does not involve unreasonable economic waste. *First National Bank of Akron* v. *Cann, supra,* at 441. It has also been said that:

"The ordinary rule of damages that an injured party is entitled to compensation for the injury sustained by the breach of a contract is applicable to the breach of building and construction contracts, and either party may recover on a breach of the contract such damages as may reasonably be considered as arising naturally from the breach of the contract itself * * *." (Citations omitted.) 13 American Jurisprudence 2d (1964) 75, Building and Construction Contracts, Section 76.

The diagnostic expenses incurred by cross-appellant were damages arising naturally from the breach of the owner-architect contract. Accordingly, we find that cross-appellant incurred additional damages of $7,124 in connection with the paving deficiencies and $1,295.60 in connection with the electrical repair.

Cross-appellant's net award was $150,316. Based on our review of the facts and applicable law, cross-appellant's net recovery is adjusted as follows:

| | |
|---|---|
| Net Award | $150,316.00 |
| Additional Electrical Damages | 1,295.60 |
| Additional Paving Damages | 7,124.00 |
| Percentage of Eller Settlement Not Set Off | 12,000.00 |
| Total | $170,735.60 |

*Judgment modified and remanded for execution.*

REILLY, P.J., and STRAUSBAUGH, J., concur.

BROGAN, J., of the Second Appellate District, sitting by assignment in the Tenth Appellate District.