OPINION
Plaintiff, Millstone Development, Ltd. ("Millstone"), is a real estate developer which began construction of a large multi-family apartment complex in 1997. Millstone hired defendant James Berry ("Berry") to install the heating, ventilation, and air conditioning units at the project. However, the relationship between Millstone and Berry soured, and he was terminated in the fall of 1997.
On December 10, 1997, Millstone sued Berry for breach of contract seeking damages as a result of defective and incomplete work which Berry had performed. A few days before trial was to begin, Berry filed for Chapter 7 bankruptcy protection with the United States Bankruptcy Court for the Southern District of Ohio. Berry's bankruptcy petition was dismissed on August 6, 1999, "for want of prosecution." The bankruptcy stay was lifted, and on February 7, 2000, plaintiff's complaint proceeded to trial before Franklin County Court of Common Pleas Magistrate, Pat Sheeran. Magistrate Sheeran issued a decision on February 10, 2000, wherein he recommended that the trial court award damages in favor of Millstone in the amount of $55,499 plus prejudgment interest in the amount of $12,024.78. The trial court adopted the magistrate's report and entered judgment in favor of Millstone on March 8, 2000. Millstone Development, Ltd. v. Berry (1997), Franklin County Court of Common Pleas case No. 97CVH-12-10871.
In January 1998, after Millstone filed its lawsuit against Berry, Berry and defendant Giuseppe Pingue ("Pingue") entered into a land installment contract whereby Berry purchased from Pingue .838 acres of land improved with a 2,700 square foot office and warehouse facilitiy. Berry occupied this property and made payments thereon until just after Magistrate Sheeran issued his decision against Berry, and only days before that decision was adopted by the trial court. Specifically, on February 29, 2000, Berry and Pingue rescinded the land installment contract, and Berry transferred all of his interest in the property back to Pingue. On May 19, 2000, Millstone commenced this lawsuit against Berry and Pingue, claiming that the February 2000 rescission constituted a fraudulent transfer pursuant to R.C. 1336.04 and/or 1336.05. Millstone Development, Ltd. v. Berry, Franklin County Court of Common Pleas case No. 00CVH-05-4529.
Millstone's complaint against Berry and Pingue came before the court for trial on May 21, 2001. During the course of trial, the court heard the evidence and arguments concerning Millstone's claims of fraudulent conveyance, as well as the argument and testimony of defendant Pingue, expert witness Terry Watson, and Terry Conner, the managing member of Millstone. The trial court also accepted several exhibits offered by Millstone, as well as evidence concerning the failure of defendant Berry and his wife to appear before the court.
On June 12, 2001, the trial court announced a decision which included comprehensive findings of fact and conclusions of law. Particularly, the court reached several legal and factual conclusions concerning Berry's financial position, and the purported resale of the property to Pingue on February 29, 2000. These findings, which are now the subject of defendant Pingue's appeal, are set forth below:
 3. According to the Bankruptcy Petition (Exhibit 10), Berry certified that his assets included his interest in the property located at 7522 Worthington-Galena Road (the "Property"), and that he had personal property of $11,752. Berry also represented in his Bankruptcy Petition that his liabilities totaled $107,569, of which included Millstone Development's claim in the Underlying Lawsuit valued at $35,000. Based upon the filings of Berry in his Bankruptcy Petition, Berry was insolvent in the summer of 1999.
 4. The Property identified by Berry in his Bankruptcy Petition is the property he was purchasing from Defendant Pingue pursuant to a Land Installment Contract dated January 26, 1998. A copy of that Land Installment Contract was introduced into evidence as Exhibit 2. It was noted at the trial that the address of the Property has changed. A legal description of the Property is attached to these Findings of Fact and Conclusions of Law as Exhibit A.
 5. Under the Land Installment Contract, Berry paid $20,000 down and made monthly payments beginning on January 26, 1998, in amounts ranging from $1,764 to $4,000. Most of the payments were in the amount of $2,000. The dates the payments were made and their amounts are set forth in Exhibit 4, which is a series of payment histories prepared by Pingue. Based upon the payment histories that Pingue produced in this case, the Plaintiff produced a summary statement describing the Berry payments and their proper application to the Land Installment Contract (Exhibit 9). Expert witness Terry Watson provided testimony concerning Exhibit 9. This Court finds that Exhibit 9 accurately reflects a summary of the payments that Berry made to Pingue pursuant to the Land Installment Contract and the proper application of those payments towards the purchase of the Property.
 6. Under the Land Installment Contract, the purchase price of the Property was $160,000. Over the course of two years, Berry paid $65,081 to Pingue, of which $42,459.82 was applied towards principal.
 7. Berry began making missing payments and making late payments towards the Land Installment Contract in September of 1999. Berry failed to make the September, 1999 payment, and was late making the payments due in October, November and December of 1999. Berry missed payments in January and February of 2000.
 8. On February 7, 2000, the Underlying Lawsuit proceeded to trial before Magistrate Pat Sheeran, and on February 10, 2000, Magistrate Sheeran issued his report awarding damages in favor of Millstone Development in the amount of $55,499, plus prejudgment interest in the amount of $12,024.78. The total judgment in favor of Millstone Development was $67,523.78. Judge Beverly Pfeiffer adopted Magistrate Sheeran's report and entered judgment in favor of Millstone Development on March 8, 2000. Copies of Magistrate Sheeran's report and Judge Pfeiffer's Judgment were introduced as Exhibits 11A and 11B, respectively.
 9. Terry Connor ("Connor") provided testimony concerning his efforts to collect on Millstone Development's judgment. It is clear that Berry was evading the collection efforts of Millstone Development, and was taking steps to hide his assets and transfer his assets for purposes of avoiding collection. Berry's evasive efforts continue through today inasmuch as he falsely represented to Roy Cline that he was not Jim Berry for purposes of avoiding service of the subpoenas that Millstone Development issued to him and his wife, Kathleen Hart, for their attendance at this trial.
 10. This Court finds that Berry was insolvent as of February 29, 2000. This Court makes this finding based upon all of the evidence produced at trial, including the bankruptcy filings filed by Berry, Berry's evasive actions to avoid collection, Berry's evasive actions to avoid appearing before this Court , and the fact that Berry was not paying his debts as they became due. Under Ohio Revised Code § 1336.02(A)(2), a debtor who is not paying his debts as they become due is presumed to be insolvent. There was no evidence produced at the trial rebutting this presumption, and all of the evidence produced at trial indicated that Berry was insolvent in that his debts were greater than all of his assets at their fair valuation.
 11. Expert witness Terry Watson provided expert testimony concerning the value of the Property as of February 29, 2000. That evidence was unrebutted. This Court finds that the value of the Property as of February 29, 2000 was $170,000. Terry Watson's expert opinion is further supported by the fact that the Land Installment Contract two years earlier was for $160,000, and that Pingue, after taking the Property back from Berry, listed the Property for sale for $225,000.
 12. This Court further finds that Berry's debt to Pingue relating to the Property as of February 29, 2000 was $122,058. In making this finding, this Court relies upon the payment histories of Pingue (Exhibit 4) and the summary presented by Plaintiff and explained by expert witness Terry Watson (Exhibit 9).
 13. This Court further finds that Berry's equity interest in the Property as of February 29, 2000 was $47,942.
 14. This Court further finds that on February 29, 2000, Berry transferred his interest in the Property to Pingue by virtue of a "Mutual Rescission of Land Contract," a copy of which was produced at trial as Exhibit 8. Although there was no reference in the rescission itself, Pingue testified that he paid to Berry the sum of $2,000 in cash, and released Berry under his obligations under the Land Installment Contract, in consideration for Berry's interest in the Property.
 15. This Court further finds that Berry transferred his interest in the Property to Pingue without receiving a reasonably equivalent value in exchange. In particular, the Property was worth $170,000. Pingue provided to Berry a total value of $124,058 ($2,000 cash, plus release of debt of $122,058).
 16. Based upon the evidence produced at trial, it appears that Berry was simply trying to secure as much cash from his interest in the Property as he could because Millstone Development would soon obtain a judgment against him, and by virtue of Millstone Development's judgment, Berry would lose any equity that he had in the Property. Millstone Development could simply foreclose on its judgment lien. Although Pingue may have not been aware of Millstone Development's claims against Berry, Pingue knew that Berry was in a distressed situation and had to sell the Property as quickly as possible because, according to Berry, he was leaving town by February 4, 2000 (Exhibit 7). However, for purposes of the Plaintiffs' claims, Millstone Development is not required to prove that Pingue knew of Millstone Development's claim or of Berry's dire circumstances.
 17. This Court found that the testimony of Pingue in this case lacked credibility. Pingue, who admitted to preparing Exhibit 4, could not explain many aspects of that exhibit, and admitted that he did not know what several parts of Exhibit 4 meant or how the figures were calculated. When examining Exhibit 4 and comparing it to the Land Installment Contract, this Court found that Pingue did not correctly apply Berry's payments to the Land Installment Contract, and attempted to find Berry in default of the Land Installment Contract in May and July of 1999, when Berry was not in default. Additionally, Pingue's attempt to reduce the principal portion of Berry's accumulated principal payments was improper. Further, this Court finds that Pingue's testimony concerning the value of the Property was inconsistent and improper. Pingue testified that the Property was listed for $165,000 when he sold it to Berry. Pingue further testified that the purchase price of $160,000 was the Property's fair market value as of January, 1998. However, less than one month after taking the Property back, Pingue authorized a Complaint to be filed with the Franklin County Auditor, Board of Revision, to have the Property revalued at $120,000 so that his tax liability on the Property would decrease. (Exhibit 12.) Mr. Terry Watson explained that the Board of Revision will consider a sale as the best evidence as the true market value of property. On the Complaint form itself (Exhibit 12), the Board of Revision asks the Complainant (Pingue) whether the Property had been sold in the past three years, and whether the Property had been listed for sale in the last three years. In Exhibit 12, both of those questions were answered in the negative. Such answers were false. Pingue testified that he was unaware of these mistakes on the Complaint, but this Court finds that if Pingue did not know, he should have known what was contained on the Complaint filed with the Franklin County Auditor, Board of Revision, because he authorized it and he is the person seeking the benefit of a reduction of the tax value of the Property. The Court finds it difficult to believe that attorney Todd Sleggs, the person who signed Exhibit 12 on behalf of Pingue, would have included the information on the Complaint without first having obtained the necessary information from Pingue himself.
 18. This Court further finds that under Ohio Revised Code § 1336.01(C), Millstone Development's claim against Berry arose on December 10, 1997, when Millstone Development commenced the Underlying Lawsuit against Berry for breach of contract.
After reciting its factual conclusions, the trial court concluded that the rescission between Berry and Pingue constituted a fraudulent conveyance under both R.C. 1336.05 and 1336.04. Applying R.C. 1336.05, the court reasoned that Berry was insolvent as of February 29, 2000, the time he transferred the property to Pingue, and further, that the transfer was not for "reasonably equivalent value." Applying R.C. 1336.04, the court concluded that Millstone had proven Berry transferred the property with the actual intent to hinder, delay, or prevent Millstone from collecting on the judgment recommended by the magistrate. As noted, the court also found that the transfer occurred for less than reasonably equivalent value. Accordingly, the court ruled that the full judgment against Berry, approximately $75,000 as of June 28, 2001, with interest to accrue until satisfied, would serve as a lien on the property transferred to Pingue. Defendant Pingue now appeals, raising the following seven assignments of error:
 [1.] The trial court erred in concluding that the mutual rescission of a land contract pertaining to commercial property resulted in the transference of equity or an asset from the vendee to the vendor as the vendee's interest had been forfeited pursuant to the land contract.
 [2.] The remedy offered Appellee, establishment of a judgment lien against Appellant's property, violates Ohio law and demonstrates the fraudulent transfer provisions of Chapter 1336, Ohio Revised Code, do not apply to equitable interest in real estate.
 [3.] The trial court erred in finding Appellee met its burden of proof with respect to the elements of a fraudulent transfer as defined in R.C. § 1336.05.
 [4.] The trial court erred in concluding the mutual rescission of land contract constituted a fraudulent transfer under R.C. § 1336.04.
 [5.] The trial court erred and abused its discretion in allowing testimony of an undisclosed expert witness which significantly prejudiced Appellant's case.
 [6.] The trial court erred in failing to conclude that Appellant gave reasonably equivalent value as consideration for the mutual rescission.
 [7.] The trial court erred in creating a lien on Appellant's property far in excess of the equity the Court found had been transferred in violation of R.C. § 1336.04 and 1336.05 and failed to account for Appellant's rights under R.C. § 1336.08.
In this case, there is no dispute that Millstone has a valid judgment against Berry. There is also no dispute that Berry purchased the subject property from Pingue, and that he made a $20,000 down payment in addition to monthly payments ranging between $1,764 to $4,000, beginning on January 26, 1998, and continuing for approximately two years. The trial court found that over this period, Berry paid Pingue $65,081, of which $42,459.82 was applied towards principle. The court concluded that as of February 29, 2000, Berry's equity interest in the property amounted to $47,942. There is also no dispute that, when faced with Millstone's judgment, Berry transferred the property back to Pingue in exchange for $2,000 in cash and a release of the balance due under the purchase contract.
In his first assignment of error, Pingue claims that the trial court erred when it concluded that the rescission of the land contract constituted a transfer from Berry to Pingue. However, the only argument offered by Pingue in support of this assignment of error is that Millstone incorrectly relied upon Chapter 5313 of the Ohio Revised Code in bringing this lawsuit. Specifically, Pingue claims in his brief that:
 * * * The basis for Appellee's position as argued in its Trial Brief and in its opening statement was that under Chapter 5313, Ohio Revised Code, if a land contract vendee had paid more than 20% of the purchase price of a land installment contract (land contract), upon default, the vendor would be required to file a foreclosure action to recover the property and that in the foreclosure the equity of the vendee would be recognized. * * * (Tr. 10).
 However, as Appellant argued to the Court by Trial Brief and by opening statement, the premise of Appellee's case was false. In fact, Chapter 5313, Ohio Revised Code, did not apply to this case because the property subject to the land contract was commercial property, not residential property, and therefore, no statutory foreclosure requirement obtained. * * * [Appellant's brief at. 6.]
Pingue's assertion to the contrary, the record reveals that Millstone did not argue that R.C. Chapter 5313 was dispositive of any issue before the court. Pingue cites to page 10 of the trial transcript in support of his claim, but in point of fact, counsel for Millstone specifically claimed that the provisions of R.C. Chapter 5313 were not applicable. Moreover, at no point in its decision did the trial court apply or rely upon any provision of law contained in R.C. Chapter 5313 of the Ohio Revised Code. Accordingly, Pingue's first assignment of error is overruled.
In his second assignment of error, Pingue argues that Millstone's judgment lien violates Ohio law. In support of this claim, Pingue argues that Berry held only an equitable interest in the property, and that equitable interests cannot be levied upon. In support of this claim, Pingue relies upon Basil v. Vincello (1990), 50 Ohio St.3d 185. However, in that case, the Ohio Supreme Court specifically found that no fraud had been perpetrated. Moreover, that case did not address R.C.2333.01, which is specifically applicable to this case, and which provides:
 When a judgment debtor does not have sufficient personal or real property subject to levy on execution to satisfy the judgment, any equitable interest which he has in real estate as a mortgagor, morgagee, or otherwise * * * shall be subject to the payment of the judgment by action.
 Pingue's second assignment of error is therefore overruled.
Pingue's third and fourth assignments of error are interrelated and will be addressed together. In those assignments of error, Pingue claims the trial court abused its discretion when it concluded that the February 29, 2000 transfer between Berry and Pingue was fraudulent under both R.C. 1336.05 and 1336.04.
R.C. 1336.05(A) provides:
 A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.
In its decision, the trial court concluded:
 Millstone Development met its burden of proving [R.C. 1336.05]. Berry was insolvent as of February 29, 2000. Additionally, when Berry transferred his interest in the Property (valued at $170,000) to Pingue, he only received a $2,000 cash payment and a release on a debt obligation of $122,058. Berry gave up over $45,000 of equity in the Property for which he received nothing.
 Pingue's argument that he forgave Berry's debt, and that this was "reasonably equivalent value" in exchange for Berry's interest in the Property is not persuasive. This argument completely ignores Berry's equity in the Property. Certainly, if the value of the Property was approximately the same as Berry's debt to Pingue ($122,000), then Pingue's argument would have merit. However, the value of the Property was $170,000 and the forgiveness of a debt obligation of $122,000 cannot be considered anywhere near "reasonably equivalent value in exchange."
The trial court continued explaining that R.C. 1336.04 is an alternative fraudulent transfer statute that applies to transfers regardless of when the claim of the creditor arose. The trial court further concluded:
 2. Ohio Revised Code § 1336.04 is an alternative fraudulent transfer statute that applies to transfers regardless of when the claim of the creditor arose. Under this section, Millstone Development is required to prove, by a preponderance of evidence, that Berry transferred his interests in the Property to Pingue in either of the following ways:
 (1) With actual intent to hinder, delay, or defraud any creditor [Millstone Development] of the debtor;
 (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies:
* * *
 (b) The debtor intended to incur or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.
 In this case, Millstone Development has proved, by a preponderance of evidence, both elements, even though it is only required to prove one.
 Under the first element, the statute provides this Court an unexhaustive list of factors to consider for purposes of establishing "actual intent" of Berry. Those factors include:
 Whether before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;
 Whether the transfer was of substantially all of the assets of the debtor;
Whether the debtor absconded;
 Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
 Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; and
 Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.
 In this case, Millstone Development established all of these factors. This Court is convinced that Berry transferred his interest in the Property to Pingue for the purpose of extracting as much cash as possible and to hinder Millstone Development from any collection efforts that it would take on the judgment that Magistrate Sheeran had recommended.
 This Court also finds that under the second element of Ohio Revised Code § 1336.04, Berry's transfer of his interest in the Property to Pingue was fraudulent. Berry did not receive reasonably equivalent value in exchange for the rescission, and Berry knew that a judgment would be taken against him shortly because the Magistrate had already issued his report awarding Millstone Development over $67,000 in damages.
When reviewing Pingue's assertion that the trial court abused its discretion, it is important that we "be guided by a presumption that the findings of the trier-of-fact were indeed correct." Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80. We also recognize that the Ohio Supreme Court has previously noted that:
 * * * [W]here the decision in a case turns upon credibility of testimony, and where there exists competent and credible evidence supporting the findings and conclusions of the trial court, deference to such findings and conclusions must be given by the reviewing court. See Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 410, 461 N.E.2d 1273, 1276; and Cohen v. Lamko, Inc. (1984), 10 Ohio St.3d 167, 10 OBR 500, 462 N.E.2d 407. * * *
 As this court observed in Seasons Coal, supra, 10 Ohio St.3d at 80, 10 OBR at 410, 461 N.E.2d at 1276: "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." [Myers v. Garson (1993), 66 Ohio St.3d 610, at 614-615.]
An abuse of discretion connotes more than an error of law or judgment. It implies that the court's attitude is clearly and palpably unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. Having carefully reviewed Pingue's claims, we are unable to find evidence that the trial court acted in a clearly arbitrary manner when it concluded that the transfer from Berry to Pingue was fraudulent. In this case, it was for the trier of fact to judge the credibility of the witnesses and to give appropriate weight to their testimony. State v. DeHass (1967), 10 Ohio St.2d 230. Accordingly, Pingue's third and fourth assignments of error are overruled.
In his fifth assignment of error, Pingue argues that the trial court abused its discretion when it heard the testimony of Terry Watson. It is well-established that the admission or exclusion of relevant evidence rests within the sound discretion of the trial court. State v. Robb (2000), 88 Ohio St.3d 59, 68, quoting State v. Sage (1987),31 Ohio St.3d 173, paragraph two of the syllabus. Absent an abuse of discretion, as well as a showing that the opposing party has suffered material prejudice, an appellate court will not disturb a ruling by a trial court as to the admissibility of evidence. See State v. Martin (1985), 19 Ohio St.3d 122, 129.
To be relevant and therefore admissible, evidence, including expert testimony, must have a tendency "to make the existence of any fact that is of consequence to the determination of the action more probable or less than it would be without the evidence." Evid.R. 401. Expert testimony is admissible if scientific, technical, or other specialized knowledge will assist the trier of fact to understand evidence or to determine a fact in issue. Stated alternatively, an expert witness may testify if his or her testimony will aid the trier of fact in search of the truth. South Union Ltd. v. George Parker Assoc., AIA, Inc. (1985),29 Ohio App.3d 197, 203.
Evid.R. 702 provides that a witness may testify as an expert if he or she possesses specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony. The testimony presented by Millstone's witness and his qualifications as an expert are matters which are entrusted to the discretion of the trial court. State v. Coleman (1999), 85 Ohio St.3d 129.
After reviewing the record and applying the aforementioned legal principles, this court finds that the trial court did not abuse its discretion when it allowed Millstone's expert witness to testify. The record demonstrates that Mr. Connor is a licensed real estate agent and developer with many years of experience. The record also demonstrates that the trial court properly considered and rejected Pingue's claim that Millstone failed to timely disclose Mr. Connor as a witness. Finding no evidence to support a conclusion that the trial court abused its discretion, or that Pingue suffered any demonstrable prejudice, we overrule his fifth assignment of error.
In his sixth assignment of error, Pingue claims that the trial court incorrectly concluded that he did not give reasonably equivalent value for the transfer of the property. It is undisputed that Pingue gave Berry $2,000 in cash for the property, and forgave Berry's remaining debt of $123,000. At that time, the property was conservatively valued to be worth $170,000. The record also contained evidence that Pingue listed the property for sale for $225,000 shortly after taking it back and had received an offer for that amount. Finally, the evidence showed that Berry had between $47,000 to over $100,000 in equity in the property. Pingue's protestations to the contrary, we find no evidence that the trial court abused its discretion when it concluded that the property had been transferred to Pingue for less than reasonably equivalent value. Pingue's sixth assignment of error is therefore overruled.
In his seventh and final assignment of error, Pingue argues that the trial court erred when it imposed a lien upon the property in excess of the value of the equity which the court found Berry to have in the property. In its findings of fact, the trial court specifically found that Berry held $47,942 in equity in the property prior to the transfer, yet the court imposed a lien upon the property for the entire amount of Millstone's judgment against Berry, which at the time of the court's entry amounted to over $70,000. While the court explained why it found Berry had acted fraudulently to prevent Millstone from collecting upon its judgment, it did not offer any explanation or justification for imposing a lien greater than the amount of equity held by Berry upon the property. Accordingly, we sustain Pingue's seventh assignment of error.
For the foregoing reasons, appellant's first through sixth assignments of error are overruled, and his seventh assignment of error is sustained. The judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part, and this cause is remanded to that court for further proceedings to reduce the amount of the judgment lien.
Judgment affirmed in part, reversed in part, and cause remanded with instructions.
TYACK, P.J., and LAZARUS, J., concur.